# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 27, 2013

No. 11-30770

Lyle W. Cayce
Clerk

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff - Appellee,

v.

BOH BROTHERS CONSTRUCTION COMPANY, L.L.C.,

Defendant - Appellant.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before STEWART, Chief Judge, and KING, JOLLY, DAVIS, JONES, SMITH, DeMOSS, DENNIS, CLEMENT, PRADO, OWEN, ELROD, SOUTHWICK, HAYNES, GRAVES, and HIGGINSON, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge, joined by STEWART, Chief Judge, and KING, DAVIS, DENNIS, PRADO, SOUTHWICK, HAYNES, GRAVES, and HIGGINSON, Circuit Judges:

This Title VII case arises out of alleged sexual harassment by Chuck Wolfe, the superintendent of an all-male crew on a construction site operated by Boh Bros. Construction Company ("Boh Brothers"). During a three-day jury trial, the Equal Employment Opportunity Commission ("EEOC") presented evidence that Wolfe subjected Kerry Woods, an iron worker on Wolfe's crew, to almost-daily verbal and physical harassment because Woods did not conform to Wolfe's view of how a man should act. The jury found in favor of the EEOC on

its hostile-environment claim, awarding compensatory and punitive damages. Boh Brothers appeals the district court's denial of its motion for judgment as a matter of law and motion for new trial. Drawing all reasonable inferences in the light most favorable to the verdict, as we must, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings consistent with this opinion.

## I.

Woods is an iron worker and structural welder. Boh Brothers hired Woods on November 3, 2005, to work on crews repairing the Twin Spans bridges between New Orleans and Slidell after Hurricane Katrina. In January 2006, the company transferred Woods to a bridge-maintenance crew. Wolfe was the crew superintendent, with about five employees under his supervision.

The worksite was an undeniably vulgar place. Wolfe and the crew regularly used "very foul language" and "locker room talk." According to other crew members, Wolfe was a primary offender: he was "rough" and "mouthy" with his co-workers and often teased and "ribbed on" them.

By April 2006, Woods had become a specific and frequent target of Wolfe's abuse. Wolfe referred to Woods as "pu--y," "princess," and "fa--ot," often "two to three times a day." About two to three times per week—while Woods was bent over to perform a task—Wolfe approached him from behind and simulated anal intercourse with him. Woods felt "embarrassed and humiliated" by the name-calling and began to look over his shoulder before bending down. In addition, Wolfe exposed his penis to Woods about ten times while urinating, sometimes waving at Woods and smiling.

One time, Wolfe approached Woods while Woods was napping in his locked car during a break. According to Woods, Wolfe "looked like he was zipping his pants" and said, "[i]f your door wouldn't have been locked, my d-ck probably would have been in your mouth."[1]

---

[1] Wolfe also made a lewd comment about Woods's daughter—"You better hope your daughter don't ever grow up and become a stripper because I won't tip her"—which made

According to Wolfe, some of his teasing originated from Woods's use of Wet Ones instead of toilet paper, which Wolfe viewed as "kind of gay" and "feminine." In an interview with the EEOC, Wolfe explained:

> Mr. Woods sat at a table with a bunch of iron workers and told us that he brought, you know, feminine wipes—not feminine wipes—but Wet Ones or whatever to work with him because he didn't like it, didn't like to use toilet paper. It's [not] the kind of thing you'd want to say in front of a bunch [of] rough iron workers that they had there. They all picked on him about it. They said that's kind of feminine to bring these, that's for girls. To bring Wet Ones to work to wipe your ass, you damn sure don't sit in front of a bunch of iron workers and tell them about it. You keep that to yourself if in fact that's what you do.

Woods complained about Wolfe's treatment to his foreman, Tim Carpenter, "two or three times." Specifically, Woods said that he "didn't like how [Wolfe] spoke to" him and asked Carpenter to reprimand Wolfe for urinating on the bridge. According to Woods, he elected not to complain about all of Wolfe's behavior because he was afraid "to cause more of a conflict."

Boh Brothers transferred Woods off of the bridge-maintenance crew to the Almonaster yard, the central location for Boh Brothers work, after an incident in November 2006. According to Boh Brothers, Woods approached an inspector with Volkert Construction Services—an entity that oversaw the Twin Spans bridges site and approved Boh Brothers's employees' time records—and asked to see the maintenance crew's time-sheets. Boh Brothers's policy prohibited an employee from viewing his co-workers' time-sheets, and Woods's purported attempt to do so was a terminable offense. The inspector reported Woods's conduct to Wolfe. Wolfe, in turn, notified Wayne Duckworth, the general superintendent for Boh Brothers's Heavy Highway Department, adding that he "didn't care for" Woods because he was "different" and "didn't fit in." Wolfe testified that, at that point, he was "done with" Woods.

---

Woods cry.

The next morning, Wolfe told Woods to meet with Duckworth. At the meeting, Woods complained in detail about Wolfe's harassment. In addition, Woods told Duckworth that Wolfe was "probably stealing company gas and shrimping on company time." According to Woods, Duckworth never mentioned anything about Woods's alleged attempt to see his co-workers' time-sheets or indicated that Woods had committed any other violation of Boh Brothers's policy. At the end of the conversation, Duckworth indicated that he would "look into" the alleged harassment. He sent Woods home without pay because, according to Duckworth, he feared "further problems" between Woods and Wolfe. Woods, believing that he had been fired, called Carpenter and asked him to intervene and "see if he could put [Woods] to work." Two days later, Carpenter called Woods and told him to report to work at the Almonaster yard.

Duckworth subsequently investigated Woods's complaint, although he did not document any aspect of his investigation. He spoke with both Wolfe and a crew foreman for about ten minutes each and determined that Wolfe's behavior, though unprofessional, did not constitute sexual harassment. Duckworth did not notify the company's general counsel about Woods's harassment allegations. He did, however, arrange a thorough investigation of Woods's claim that Wolfe stole company gas and used company equipment for personal purposes. Boh Brothers hired a private detective agency to evaluate the issue, resulting in 84.75 hours of work and two reports.[2]

Woods initially filed an EEOC charge questionnaire in November 2006, shortly after his removal from the Twin Spans maintenance crew, alleging he had been "fired" from that job and, three days later, hired to work at a different Boh Brothers location. In February 2007, Boh Brothers laid Woods off for lack of work. That March, Woods filed an EEOC charge of discrimination, alleging sexual harassment and, on the basis of his November 2006 removal from the

---

[2] After receiving the agency's report, Boh Brothers demoted Wolfe temporarily but did not reduce his pay.

maintenance crew, retaliation.

The EEOC brought this enforcement action on Woods's behalf in September 2009, claiming sexual harassment and retaliation under Title VII. Following a three-day trial, the jury returned a verdict in favor of Woods on the harassment claim and in favor of Boh Brothers on the retaliation claim. The jury awarded Woods $201,000 in compensatory damages and $250,000 in punitive damages. The district court reduced the compensatory damages award to $50,000 to comply with the $300,000 statutory damages cap. 42 U.S.C. § 1981a(b)(3)(D). Boh Brothers filed a renewed motion for judgment as a matter of law following entry of judgment and a motion for new trial, both of which the court denied. Boh Brothers timely appealed.

A panel of this court overturned the jury verdict. According to the panel, the evidence was insufficient as a matter of law to sustain the jury's finding that Wolfe discriminated against Woods "because of . . . sex" in violation of Title VII. *EEOC v. Boh Bros. Constr. Co., L.L.C.*, 689 F.3d 458, 459 (5th Cir. 2012). The EEOC subsequently sought and obtained *en banc* review.

## II.

"[O]ur standard of review with respect to a jury verdict is especially deferential." *SMI Owen Steel Co., Inc. v. Marsh U.S.A., Inc.*, 520 F.3d 432, 437 (5th Cir. 2008) (quoting *Flowers v. S. Reg'l Physician Servs., Inc.*, 247 F.3d 229, 235 (5th Cir. 2001)) (internal quotation marks omitted). Although we review the denial of a motion for judgment as a matter of law *de novo*, we apply the same legal standard as the district court. *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 498 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 1585 (2013) (citation omitted). Under that standard, a litigant cannot obtain judgment as a matter of law "unless the facts and inferences point 'so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion.'" *Id.* (quoting *Flowers*, 247 F.3d at 235). As the D.C. Circuit has eloquently explained:

We are not to tamper lightly with the considered judgment of those

drawn together at one point in time to render a judgment that is representative of the good common sense of the American people. It goes without saying that few institutions are as venerable as that of trial by jury, enshrined at the Founding in the Bill of Rights and hallowed by an enormous body of English and American law that commands judges, who are of all officials the least accountable to the people, not to invade the province of judgment by the people.

*Stacey v. Allied Stores Corp.*, 768 F.2d 402, 406 (D.C. Cir. 1985).

Thus, we must draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that we might regard as more reasonable. *Westlake Petrochems., L.L.C. v. United Polychem, Inc.*, 688 F.3d 232, 239 (5th Cir. 2012). For "it is the function of the jury as the traditional finder of the facts, and not for the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." *Roman v. W. Mfg., Inc.*, 691 F.3d 686, 692 (5th Cir. 2012) (quoting *Mosley v. Excel Corp.*, 109 F.3d 1006, 1009 (5th Cir. 1997)). The jury is "free to choose among reasonable constructions of the evidence." *United States v. Ramos-Cardenas*, 524 F.3d 600, 605 (5th Cir. 2008). Thus, we "cannot reverse a denial of a motion for judgment as a matter of law unless the jury's factual findings are not supported by substantial evidence, or if the legal conclusions implied from the jury's verdict cannot in law be supported by those findings." *Am. Home Assurance Co. v. United Space Alliance, LLC*, 378 F.3d 482, 488 (5th Cir. 2004).

## III.

This appeal involves the EEOC's hostile-work-environment claim pursuant to Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000e-2(a)(1). Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Id.* "The creation of a hostile work environment through harassment . . . is a form of proscribed discrimination." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2455 (2013) (Thomas, J., concurring)

(citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998); *Meritor Sav. Bank, F.S.B. v. Vinson*, 477 U.S. 57, 64–65 (1986)).

Under Title VII, an employer's liability for workplace harassment depends on the status of the harasser:

> If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a "supervisor," however, different rules apply. If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided. Under this framework, therefore, it matters whether a harasser is a "supervisor" or simply a co-worker.

*Id.* at 2439 (citations omitted). An employee is a supervisor if "he or she is empowered by the employer to take tangible employment actions against the victim." *Id.*[3]

Where a harassment claim arises out of a supervisor's conduct, "there are four elements of a hostile working environment claim: (1) that the employee belongs to a protected class; (2) that the employee was subject to unwelcome sexual harassment; (3) that the harassment was based on [a protected characteristic]; and (4) that the harassment affected a 'term, condition, or privilege' of employment." *Lauderdale v. Tex. Dep't of Criminal Justice*, 512 F.3d 157, 162–63 (5th Cir. 2007). To affect a term, condition, or privilege of employment, the harassing conduct "must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Aryain v. Wal-Mart Stores of Tex., L.P.*, 534 F.3d 473, 479 (5th Cir. 2008) (alteration in original) (quoting *Lauderdale*, 512 F.3d at 163). We use an objective "reasonable person"

---

[3] Wolfe testified that he had the authority to fire, discipline, and transfer employees during the relevant period—qualifying him as a supervisor under *Vance*.

standard to evaluate severity and pervasiveness. *Oncale*, 523 U.S. at 82. Ultimately, whether an environment is hostile or abusive depends on the totality of circumstances. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

In the context of same-sex discrimination, we typically analyze these elements by way of a two-step inquiry. *La Day v. Catalyst Tech., Inc.*, 302 F.3d 474, 478 (5th Cir. 2002). First, we consider whether the alleged conduct was sex discrimination and, second, we evaluate whether the conduct meets the standard for a *quid pro quo* or hostile-work-environment claim. *Id.* "For example, same-sex harassment that is 'severe or pervasive' enough to create a hostile environment might be excluded from the coverage of [T]itle VII because it was not discriminatory on the basis of sex." *Id.* (citation omitted). Or, "[o]n the other hand, same-sex harassment that is indisputably discriminatory might not be serious enough to make out either a *quid pro quo* or hostile environment claim." *Id.* (citation omitted).

Applying this inquiry here, the most critical issues on appeal are whether the EEOC presented sufficient evidence that (1) Wolfe harassed Woods "because of . . . sex" as required by Title VII, and (2) Wolfe's harassment was severe or pervasive. We turn to the because-of-sex issue first.

## A.

At trial, the EEOC relied on gender-stereotyping evidence to prove that Woods suffered discrimination on the basis of sex. Specifically, the EEOC asserted that Wolfe harassed Woods because Woods was not a manly-enough man in Wolfe's eyes. On appeal, Boh Brothers argues that (1) the EEOC cannot, as a matter of law, rely on gender-stereotyping evidence to establish a same-sex harassment claim, and (2) even if it could, the evidence here was insufficient to sustain the jury verdict. As explained below, both of these arguments fail.

### 1.

More than two decades ago, the Supreme Court held that a plaintiff may

rely on gender-stereotyping evidence to show that discrimination occurred "because of . . . sex" in accordance with Title VII. *See Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). In *Price Waterhouse*, a woman with an "aggressive" personality sued after her accounting firm passed her up for partnership. *Id.* at 235. The Court saw "clear signs . . . that some of the partners reacted negatively to [the plaintiff's] personality because she was a woman. One partner described her as 'macho'; another suggested that she 'overcompensated for being a woman'; a third advised her to take 'a course at charm school.'" *Id.* (citations omitted). The plaintiff's evaluators suggested that she should "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." *Id.* (citation and internal quotation marks omitted). The Court declared:

> [W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for in forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.

*Id.* at 251 (internal quotation marks, alteration, and citations omitted). Thus, while "[r]emarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision," they "can certainly be *evidence* that gender played a part." *Id.*

Following this pronouncement, numerous courts, including ours, have recognized that a plaintiff can satisfy Title VII's because-of-sex requirement with evidence of a plaintiff's perceived failure to conform to traditional gender stereotypes. *See, e.g.*, *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1085 (5th Cir. 1994) (noting that the offensive comments in *Price Waterhouse* "cannot reasonably be interpreted as anything other than a reflection of [gender-based]

bias").[4]

Nine years after *Price Waterhouse*, a unanimous Supreme Court held that "nothing in Title VII necessarily bars a claim of discrimination 'because of . . . sex' merely because the plaintiff and the defendant (or the person charged with acting on behalf of the defendant) are of the same sex." *Oncale*, 523 U.S. at 79. While "male-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII," the Court acknowledged that "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Id.* The *Oncale* Court emphasized that Title VII is not a general civility code for the American workplace, regardless of whether opposite-sex or same-sex harassment is at issue. *Id.* at 80. In either case, a plaintiff must prove that the discrimination occurred because of sex and that the harasser's behavior was so objectively offensive as to alter the conditions of his or her employment. *Id.* at 80–81. With this well-settled legal standard in mind, we reject the argument in Judge Jones's dissent that this opinion would require employers to "purge every workplace of speech and gestures that might be viewed in any way as tokens of sex discrimination." As the Supreme Court has emphasized, "[w]hatever

---

[4] *See also Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011) (recognizing *Price Waterhouse*'s gender-stereotype holding); *Lewis v. Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1038 (8th Cir. 2010) (same); *Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 44 (1st Cir. 2009) (same); *Smith v. City of Salem*, 378 F.3d 566, 573 (6th Cir. 2004) (same); *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 120 (2d Cir. 2004) (same); *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 874–75 (9th Cir. 2001) (same); *Bibby v. Phila. Coca-Cola Bottling Co.*, 260 F.3d 257, 263–64 (3d Cir. 2001) (same); *Doe v. City of Belleville*, 119 F.3d 563, 580 (7th Cir. 1997), *vacated*, 523 U.S. 1001 (1998) (same). Although Boh Brothers relies on the Supreme Court's vacating of *City of Belleville* to argue that gender-stereotyping claims are unavailable to same-sex plaintiffs, we note that the Third Circuit reads the tea leaves exactly the opposite: "Absent an explicit statement from the Supreme Court that it is turning its back on *Price Waterhouse*, there is no reason to believe that the remand in *City of Belleville* was intended to call its gender stereotypes holding into question." *Bibby*, 260 F.3d at 263 n.5.

evidentiary route the plaintiff chooses to follow, he or she must *always* prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimina[tion]* . . . because of . . . sex.'" *Id.* (first emphasis added)).[5]

The *Oncale* court charted three evidentiary paths for plaintiffs to make this showing in the context of a same-sex harassment claim: (1) a plaintiff may show that the harasser was homosexual and motivated by sexual desire; (2) a plaintiff may show that the harassment was framed "in such sex-specific and derogatory terms . . . as to make it clear that the harasser [was] motivated by general hostility to the presence" of a particular gender in the workplace; and (3) a plaintiff may "offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." *Id.* Boh Brothers argues that these three routes are the *exclusive* paths to success on a Title VII same-sex harassment claim. Our sister circuits uniformly disagree.[6] Every

---

[5] It may be difficult judicially to assess whether and how harassment between two members of the same sex, neither of whom is homosexual, is "because of" the victim's sex. But cruelty and irrationality typify harassment, prejudice, stereotyping and hostility generally, *see, e.g.*, *Oncale*, 523 U.S. 75; *Price Waterhouse*, 490 U.S. 228, and we echo the Supreme Court's confidence that "[c]ommon sense, and an appropriate sensitivity to social context will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." *Oncale*, 523 U.S. at 82.

[6] *See, e.g.*, *Medina v. Income Support Div., N.M.*, 413 F.3d 1131, 1135 (10th Cir. 2005) ("These routes, however, are not exhaustive."); *Pedroza v. Cintas Corp.*, 397 F.3d 1063, 1068 (8th Cir. 2005) (describing *Oncale*'s list as "non-exhaustive"); *Bibby*, 260 F.3d at 264 (noting the evidentiary routes stated in *Oncale* and stating: "[b]ased on the facts of a particular case and the creativity of the parties, other ways in which to prove that harassment occurred because of sex may be available"); *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009 (7th Cir. 1999) ("[W]e discern nothing in the Supreme Court's [*Oncale*] decision indicating that the examples it provided were meant to be exhaustive rather than instructive.").

In addition to the above-cited circuits, we note that the Sixth Circuit acknowledged the availability of an evidentiary route not articulated in *Oncale* in 2006. *See Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 763–65 (6th Cir. 2006). In a subsequent case, the Sixth Circuit noted that *Oncale* offered "guidance" regarding the manner in which a plaintiff can prove same-sex harassment. *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 467–68 (6th Cir. 2012).

circuit to squarely consider the issue has held that the *Oncale* categories are illustrative, not exhaustive, in nature. Considering that the Court used "for example" and "[w]hatever evidentiary route the plaintiff chooses to follow" in its discussion of those categories, we agree. *See id.* at 80–81.

In sum, nothing in *Oncale* overturns or otherwise upsets the Court's holding in *Price Waterhouse*: a plaintiff may establish a sexual harassment claim with evidence of sex-stereotyping.[7] Thus, the EEOC may rely on evidence that Wolfe viewed Woods as insufficiently masculine to prove its Title VII claim.[8]

**2.**

---

Although the court arguably treated the *Oncale* categories as if they were exclusive in *Wasek*, it did not expressly consider the issue because the plaintiff's claim fell into *Oncale*'s first category. *Id.* In any event, the Sixth Circuit follows the rule of orderliness, so *Vickers*, not *Wasek*, controls. 6th Cir. R. 206(c) ("Reported panel opinions are binding on subsequent panels."); *see Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985).

[7] Indeed, courts across the country have applied *Price Waterhouse* in cases of same-sex discrimination since *Oncale*. *See Vickers*, 453 F.3d at 763 (holding that *Price Waterhouse* creates a cause of action for sex discrimination based on an individual's failure to conform to gender stereotypes, but rejecting plaintiff's claim because he "made no argument that his appearance or mannerisms on the job were perceived as gender non-conforming in some way and provided the basis for the harassment he experienced"); *Medina*, 413 F.3d at 1134–35 (suggesting, in a same-sex harassment case, that a hostile environment motivated by harasser's desire "to punish the plaintiff's noncompliance with gender stereotypes" would be unlawful); *Nichols*, 256 F.3d at 874–75 (holding that a male plaintiff harassed by male co-workers because they viewed him as effeminate proved his Title VII claim); *Bibby*, 260 F.3d at 262–63 (ruling in a same-sex harassment case that a "plaintiff may be able to prove that same-sex harassment was discrimination because of sex by presenting evidence that the harasser's conduct was motivated by a belief that the victim did not conform to the stereotypes of his or her gender"); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 261 n.4 (1st Cir. 1999) (holding that, after *Oncale*, the issue of whether same-sex harassment based on gender stereotyping is actionable is "no longer open"); *City of Belleville*, 119 F.3d at 581 ("[A] man who is harassed [by male co-workers] because . . . he exhibits his masculinity in a way that does not meet his coworkers' idea of how men are to appear and behave is harassed 'because of' his sex.'"); *see also Lewis*, 591 F.3d at 1038–41; *Dawson v. Bumble & Bumble*, 398 F.3d 211, 218 (2d Cir. 2005); *Smith*, 378 F.3d at 571–75.

[8] As the panel opinion correctly observed, there is no allegation that either Woods or Wolfe is homosexual.

Boh Brothers further argues that, even if the EEOC's sex-stereotyping theory is cognizable in this context, the evidence is insufficient to support the jury's finding that Wolfe harassed Woods "because of . . . sex." We disagree.

In conducting this intent-based inquiry, we focus on the alleged harasser's subjective perception of the victim. Thus, even an employer's wrong or ill-informed assumptions about its employee may form the basis of a discrimination claim. *See, e.g.*, *Black v. Pan Am. Labs., L.L.C.*, 646 F.3d 254, 260 (5th Cir. 2011) (affirming a jury verdict in favor of a female sexual-harassment plaintiff who introduced evidence that decision-makers made sex-based comments—that "women [are] a detriment to the company," women "get hired on, get married, and/or get pregnant and they leave," and that the plaintiff did not need to worry about her sales quota because "it shouldn't matter to you, you're not the breadwinner anyway"—without requiring the plaintiff to show that her harasser's obviously sexist perceptions were true); *EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 401–02 (5th Cir. 2007) (holding that a Muslim man's national-origin discrimination claim survived summary judgment even though his harassers did not know his country of origin) (collecting cases).[9] We do not require a plaintiff to prop up his employer's subjective discriminatory animus by proving that it was rooted in some objective truth; here, for example, that Woods was not, in fact, "manly."[10] Rather, in considering the *motivation* behind a

---

[9] Other circuits take the same approach. *See, e.g.*, *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1299–1300 (11th Cir. 2012) (holding that an African American man's race-based hostile-work-environment claim could survive summary judgment although his harassers mistakenly believed he was Indian); *cf. Estate of Amos ex rel. Amos v. City of Page, Ariz.*, 257 F.3d 1086, 1094 (9th Cir. 2001) ("That Amos was actually white does not make that discrimination or its resulting injury less direct. Thus, for purposes of standing, Amos should be viewed as Trustee alleges the police officers viewed him: as a Native American. The City's alleged discrimination is no less malevolent because it was based upon an erroneous assumption.").

[10] Judge Jolly's approach—which would have the court assess a plaintiff's "objective" status, here, that Woods was "unquestionably manly"—is inconsistent with this circuit's

harasser's behavior, we look to evidence of the harasser's subjective view of the victim.[11]

Applying these principles here, and drawing all reasonable inferences in the light most favorable to the verdict, there is enough evidence to support the jury's conclusion that Wolfe harassed Woods because of sex. Specifically, the EEOC offered evidence that Wolfe, the crew superintendent, thought that Woods was not a manly-enough man and taunted him tirelessly. Wolfe called Woods sex-based epithets like "fa--ot," "pu--y," and "princess," often "two to three times" per day.[12] Wolfe himself admitted that these epithets were directed at Woods's masculinity:

> Q.    Now, when you said that Mr. Woods was kind of gay for using Wet Ones, you were saying that he was feminine; is that correct?

---

longstanding precedent. *See Capaci v. Katz & Besthoff, Inc.*, 711 F.2d 647, 660 (5th Cir. 1983) (noting that Title VII would apply even if an employer advertised for a particular job only in "male wanted" columns "out of a sincere belief that females would not be interested in the job, such a belief is precisely the kind of stereotyped assumption that Title VII is aimed at eliminating"); *Pond v. Braniff Airways, Inc.*, 500 F.2d 161, 166 (5th Cir. 1974) ("[I]f the employer in any way permits stereotypical culturally-based concepts of the abilities of people to perform certain tasks because of their sex to creep into its thinking, then Title VII will come to the employee's aid."); *see also  Black*, 646 F.3d at 260; *WC&M Enters.*, 496 F.3d at 401–02.

[11] Of course, this does not eliminate all objective analysis in the Title VII inquiry. As discussed below, we consider the severity and pervasiveness of alleged harassment based on whether a "reasonable person in the plaintiff's position would find [it] severely hostile or abusive." *Oncale*, 523 U.S. at 82. Moreover, objective evidence of a victim's conformance, or failure to conform, to a particular stereotype may inform, but does not dictate, our analysis of a harasser's subjective view of the victim.

[12] These insults lend themselves to a reasonable inference on the part of the jury that Wolfe viewed Woods as insufficiently masculine. *See Nichols*, 256 F.3d at 874 ("At its essence, the systematic abuse directed at Sanchez reflected a belief that Sanchez did not act as a man should act. . . . Sanchez's male co-workers and one of his supervisors repeatedly reminded Sanchez that he did not conform to their gender-based stereotypes, referring to him as 'she' and 'her.' And, the most vulgar name-calling directed at Sanchez was cast in female terms. We conclude that this verbal abuse was closely linked to gender."). But, importantly, the evidence presented in this case does not depend on these insults alone. As discussed below, Wolfe engaged in several physical acts of flashing and humping at the work site, specifically and consistently aimed at Woods.

No. 11-30770

A.  I didn't say he was gay.  Said it . . . seemed kind of gay . . . .

Q.  So you wouldn't say that he was gay, but you say his conduct was kind of gay?

A.  Yes, sir[.]

Q.  By saying that, you were saying he was feminine; correct?

A.  Yes.

Q.  You meant he was not being manly; is that correct?

A.  Yes, sir.

Q.  When you said that Mr. Woods'[s] conduct sounded like a homo, that again refers to Mr. Woods being feminine for using Wet Ones; is that correct?

A.  Yes, sir. . . .

Q.  And . . . when you were talking with the EEOC investigator about the wet wipes or the Wet Ones, you initially called them feminine wipes; correct?

A.  Yes, sir.  I believe I did.

Q.  And that's because you believed that Wet Ones [are] something that girls should use but men should not?

A.  Or babies, yeah, that's correct.

Q.  So you had stereotypes of how a man should act, and Mr. Woods didn't fit in to those stereotypes because he used Wet Ones and then talked about it in front of a bunch of hairy iron workers; correct?

A.  I don't agree with that, no, no.  He was an iron worker just like the rest of [t]hem.  He performed and did his job just like everyone else.  We was just playing. . . .

Q.  Let me draw your attention to testimony that you gave in your sworn interview. . . . ["Mr. Woods sat at a table with a bunch of iron workers and told us that he brought, you know, feminine wipes—not feminine wipes but Wet Ones or whatever to work with him because he didn't like it, didn't like to use toilet paper.  It's [not] the kind of thing you'd want to say in front [of] a bunch rough iron workers that they had there.  They all picked on him about it.  They said that's kind

15

of feminine to bring these, that's for girls. To bring Wet Ones to work to wipe your ass, you damn sure don't sit in front of a bunch of iron workers and tell them about it. You keep that to yourself if in fact that's what you do."] Was that truthful testimony?

A.   Yes, sir.

Q.   You also called Mr. Woods princess; correct?

A.   Yes, sir.

Q.   And, when you called him princess, that related to the fact that you thought he was feminine; correct?

A.   I guess so, yes, sir. . . .

Q.   So the only iron worker that you ever called queer was Mr. Woods?

A.   I'm thinking so.

Q.   And was Mr. Woods the only iron worker that you called fa--ot?

A.   I'm not sure.

Q.   Do you understand the word queer to be a slang for homosexual?

A.   Yes, I do. I just don't remember if I used it for anyone else, too. I may have.

Q.   And you understand that the word fa--ot is a slang for homosexual?

A.   Yes.

Q.   And you called Mr. Woods those words because you thought he was feminine; correct?

A.   No, sir. I was just playing with him. I did not think he was queer or homosexual. Never did, do not now.

Q.   You called him those words because you thought his using wet wipes was feminine; correct?

A.   Yes, sir.

Q.   And you admit that you called Mr. Woods pu--y; correct?

A.    Yes, sir.

Q.    And, in your experience, is that a slang word that one would use for a man who is not manly?

A.    Guess so.

Q.    So all the allegations by Mr. Woods about the names that you called him that related to his being feminine because he used the Wet Ones, those allegations are all true; correct?

A.    Yes.

In addition to this name-calling, Wolfe mocked Woods with several other sexualized acts. For example, Woods testified that Wolfe would approach him from behind and "hump" him two to three times per week (which equates to more than 60 instances of simulated anal sex), that Wolfe exposed his genitals to Woods (sometimes while smiling and waving) about ten times, and that Wolfe suggested that he would put his penis in Woods's mouth.[13]

Viewing the record as a whole, a jury could view Wolfe's behavior as an attempt to denigrate Woods because—at least in Wolfe's view—Woods fell outside of Wolfe's manly-man stereotype.[14] Thus, we cannot say that no

[13] Considering this evidence, this case is not—as Judge Jones's dissent suggests—about vulgar speech in the workplace, nor does it impose a government-compelled workplace speech code. Indeed, it appears that both Judge Jolly's dissent and Judge Jones's dissent operate from a different record: they either ignore this evidence, or construe it against—not in favor of—the jury verdict. The evidence here extends far beyond isolated insults and occasional horseplay. Accordingly, we must defer to the jury's determination that it rose to the level of sexual harassment.

[14] The EEOC presented testimony by Dr. Liza Gold—a medical-school professor, board-certified psychiatrist, and author of a treatise on sexual harassment—regarding the nature of same-sex harassment from a psychological perspective. Boh Brothers sought to exclude Dr. Gold's testimony in a pre-trial *Daubert* motion, which the district court granted in part. Specifically, the district court held that Dr. Gold could testify regarding sexual harassment studies from a psychological perspective but could not offer any opinions regarding the specific facts of the case. Boh Brothers contends that, despite this limitation, Dr. Gold's testimony served as "a means to instruct the jury on the EEOC's view of how the law of same-sex harassment should be interpreted." As a result, Boh Brothers moved for a new trial. The district court carefully considered the issue, and ultimately denied the motion. "We will reverse the trial court's denial of a motion for new trial only when there is a clear showing of

reasonable juror could have found that Woods suffered harassment because of his sex. Having reached this conclusion, we turn to the second critical question

---

an abuse of discretion." *Carr v. Wal-Mart Stores, Inc.*, 312 F.3d 667, 670 (5th Cir. 2002); *see Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 881 (5th Cir. 2013) (citation and quotation marks omitted) ("In rulings on the admissibility of expert opinion evidence the trial court has broad discretion and its rulings must be sustained unless manifestly erroneous."). Having carefully reviewed the record, we conclude that Dr. Gold's limited testimony was well within the bounds of admissible evidence. Accordingly, we discern no manifest error or abuse of discretion in the district court's rulings.

Despite our deferential standard of review and the district court's careful limitation of the Dr. Gold's testimony, Judge Jones's dissent would reverse the jury verdict on the basis that Dr. Gold's testimony *may* have been unhelpful and confusing to the jurors. First, it cites Federal Rule of Evidence 702, which provides that expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). We note, however, that the helpfulness threshold is low: it is "principally . . . a matter of relevance. Expert testimony which does not relate to any issue in the case is not relevant, and ergo, non-helpful." *Roman v. W. Mfg., Inc.*, 691 F.3d 686, 694 (5th Cir. 2012) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993)); *see United States v. Posado*, 57 F.3d 428, 433 (5th Cir.1995). Here, we cannot agree that Dr. Gold's testimony regarding the nature of same-sex harassment was so unhelpful as to have been not only inadmissible, but also reversible error.

Second, Judge Jones's dissent asserts that Dr. Gold's testimony may have conflated the "sociological" and the legal perspective of sexual harassment. But Dr. Gold's testimony specifically and repeatedly distinguished between the two, emphasizing that "harassment in the social scientist's eyes . . . may not constitute legal sexual harassment . . . [and] is not limited to the legal concept of sexual harassment." Even if Dr. Gold's testimony had some bearing on the ultimate issue, the Federal Rules of Evidence allow for such testimony. *See* Fed. R. Evid. 704 (indicating that, regarding expert testimony, "an opinion is not objectionable just because it embraces an ultimate issue"). Moreover, the district court—present for Dr. Gold's testimony and closest to the jurors—heard and rejected precisely the position that Judge Jones's dissent articulates. The district court instructed the jurors: "It is your duty to follow the law as I give it to you" and "you are not required to accept [an expert's] opinion . . . it's up to you to decide whether to reply upon it." In denying Boh Brothers's motion for new trial, the district court concluded: "It's not even approaching a miscarriage of justice to allow an expert to give definitions and examples of to highlight those examples, and never did she refer to this particular case until [Boh Brothers's] cross examination when [it] asked her about those particular areas." Considering the district court's thorough consideration of Dr. Gold's testimony and the high standard that applies to appellate review of motions for new trial, we decline to step into the district court's gatekeeping shoes. *In re MBS Mgmt. Servs., Inc.*, 690 F.3d 352, 357 (5th Cir. 2012) (noting that "*the trial judge* serves as a gatekeeper to ensure the reliability and relevance of expert testimony" (emphasis added)); *Gabriel v. City of Plano*, 202 F.3d 741, 745 (5th Cir. 2000) ("We reverse judgments for improper evidentiary rulings only where the challenged ruling affects a substantial right of a party. The burden of proving substantial prejudice lies with the party asserting error." (internal quotation marks and citations omitted)).

18

on appeal: whether the alleged abuse was sufficiently severe or pervasive to support Title VII liability.

## B.

Boh Brothers asserts that, even if Wolfe harassed Woods because of sex, the district court should have granted its Rule 50(b) motion because Wolfe's harassment was not severe or pervasive as a matter of law.

As the Supreme Court has explained, Title VII is not "a general civility code for the American workplace." *Oncale*, 523 U.S. at 80. Thus, we view the alleged harassment with "[c]ommon sense, and an appropriate sensitivity to social context" to determine whether it constitutes "conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive."[15] *Id.* at 82. This inquiry is necessarily fact-specific. *See Alaniz v. Zamora-Quezada*, 591 F.3d 761, 771 (5th Cir. 2009).

Here, the jury was well-instructed on this governing standard:

> For Defendant to be liable for sexual harassment, the conduct must be sufficiently severe or pervasive to alter the terms or conditions of Plaintiff's employment and create a hostile or abusive work environment. To determine whether the conduct in this case rises to a level that alters the terms or conditions of Plaintiff's employment, you should consider all the circumstances, including: the frequency of the conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with Plaintiff's work performance. There is no requirement that the conduct be psychologically injurious.
>
> Although sexual harassment must be based on sex, it need not be motivated by sexual desire. Sexual harassment may include

---

[15] While a plaintiff cannot recover unless the conduct actually offended him or her, the application of a reasonable person standard prevents us from affirming damage awards to compensate overly-sensitive plaintiffs for hurt feelings. *See Shepherd*, 168 F.3d at 874 ("To be actionable, the challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so." (emphasis added) (citation omitted)).

19

extremely insensitive conduct because of sex/gender.    Simple teasing, offhand comments, sporadic use of offensive language, occasional gender-related jokes, and isolated incidents (unless extremely serious) will generally not amount to discriminatory changes in the terms and conditions of employment. Discriminatory intimidation, ridicule, sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature in the workplace may be sufficiently extreme to alter the terms and conditions of employment.

Hearing this instruction, the jury concluded that Wolfe's harassment of Woods was sufficiently severe or pervasive to satisfy the governing standard.  There is enough evidence in the record to support the jury's conclusion.

Woods specifically testified that he was a unique and constant target of Wolfe's abuse.[16]  For example, Woods testified on direct examination:

> Q.    In your experience, is it common on a construction site for this type of behavior you've described to take place?
>
> A.    No.
>
> Q.    Has any supervisor ever treated you like this at any other job you've held?
>
> A.    No.
>
> Q.    Has anybody ever treated you like this on any job you've held?
>
> A.    No.
>
> Q.    In your opinion, did Mr. Wolfe treat the other members of the maintenance crew the same way he treated you?
>
> A.    No.

---

[16] For this reason, the facts simply do not support the assertion made in both Judge Jolly's dissent and Judge Jones's dissent that every man on the Boh Brothers work site could establish a Title VII claim against the company.  To reach that conclusion is to ignore the evidence, as considered and found by the jury, that Wolfe specifically and consistently directed his abuse at Woods.

Q.    What was the difference?

A.    He treated them—he treated them more like you're supposed to treat a grown man.  He didn't pick—he didn't harass them like he harassed me all the time.

Q.    Did you ever see Mr. Wolfe show somebody else his penis?

A.    No.

Q.    Did you ever hear Mr. Wolfe say anything about putting his penis in somebody's mouth to somebody else?

A.    No.

Wolfe himself conceded that he called *only* Woods "queer"; he did not recall whether he called anyone else "fa--ot," a name he used regarding Woods on a consistent basis.  This, alongside all of the evidence discussed above in Section III(A)—the repeated humping, the reference to oral sex, etc.—is sufficient for a reasonable juror to conclude that Wolfe's harassment was sufficiently severe or pervasive to alter the conditions of Woods's employment.[17]  Wolfe hurled raw sex-based epithets uniquely at Woods two-to-three times a day, almost every day, for months on end.  We have upheld a jury verdict on analogous facts.  *See, e.g.*, *Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803, 806 (5th Cir. 1996) (plaintiff presented sufficient evidence from which a jury could find severe or pervasive harassment where plaintiff was subjected to offensive, sex-based comments two to three times per week); *cf. WC&M Enters.*, 496 F.3d at 400 (reversing summary judgment in favor of a defendant where a plaintiff was subjected to verbal harassment—including nicknames like "Taliban" and

---

[17] Boh Brothers offered some contradictory evidence at trial.  But we must draw all reasonable inferences in the light most favorable to the verdict. *Westlake Petrochems.*, 688 F.3d at 239.  Weighing the credibility of the various witnesses and their testimony is a task for the jury, not this court. *Roman*, 691 F.3d at 692; *Ramos-Cardenas*, 524 F.3d at 605.

"Arab"—on "a regular basis for a period of approximately one year"); *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000) (holding that African-American employees who were subjected to a variety of racial slurs over a three-year period raised a fact issue as to whether slurs were sufficiently severe or pervasive), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Accordingly, we conclude that there was sufficient evidence for a reasonable juror to conclude that Wolfe's harassment of Woods was severe or pervasive.[18]

## IV.

Having decided that the evidence is sufficient to support the EEOC's Title VII claim, we turn to Boh Brothers's alternative arguments, evaluating whether the company established its *Ellerth/Faragher* affirmative defense, whether the evidence is sufficient to support the jury's punitive damages award, and whether the district court properly awarded injunctive relief in favor of the EEOC.

## A.

Boh Brothers argues that it established an *Ellerth/Faragher* affirmative defense as a matter of law. *See Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). Under this defense, an employer will not be vicariously liable for harassment by a supervisor if it can show: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."

---

[18] Judge Jolly's dissent criticizes our purported failure to account for the fact that these actions occurred on an all-male construction site, which he contends is a customarily vulgar and crude setting. But the well-instructed jury was just as capable as we are of evaluating the social context surrounding Wolfe's harassment. We cannot, and should not, inject our own view of the evidence at this stage of the case. Rather, we must defer to the jury verdict unless no reasonable juror could conclude that Wolfe's harassment was severe or pervasive.

*Watts v. Kroger Co.*, 170 F.3d 505, 509–10 (5th Cir. 1999) (quoting *Faragher*, 524 U.S. at 807) (internal quotation marks omitted). The employer bears the burden to prove *both* elements by a preponderance of the evidence. *Aryain*, 534 F.3d at 483 (citing *Ellerth*, 524 U.S. at 765). In analyzing the evidence, we draw all reasonable inferences in the light most favorable to the verdict. *Westlake Petrochems.*, 688 F.3d at 239.

The jury expressly rejected Boh Brothers's *Ellerth/Faragher* defense at trial. The interrogatories submitted to the jury asked whether Boh Brothers satisfied the individual elements of the defense, and the jury answered "no" regarding both. We begin and end our analysis with the first prong: whether Boh Brothers established that it exercised reasonable care to prevent and promptly correct Wolfe's sexually harassing behavior.

An employer can satisfy the first prong of the *Ellerth/Faragher* defense by implementing suitable institutional policies and educational programs regarding sexual harassment. *See, e.g.*, *Lauderdale*, 512 F.3d at 164; *Wyatt v. Hunt Plywood Co.*, 297 F.3d 405, 413 (5th Cir. 2002). As the Supreme Court noted in *Ellerth*, "[w]hile proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense." 524 U.S. at 765. Thus, we often look to an employer's policies and programs in determining whether it took reasonable measures to prevent discriminatory behavior. *See, e.g.*, *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 437–39 (5th Cir. 2005); *Hockman v. Westward Commc'ns, L.L.C.*, 407 F.3d 317, 329–30 (5th Cir. 2004). Not every policy eliminates liability; generic policies that offer no specific complaint

procedure may be insufficient to satisfy the *Ellerth/Faragher* defense.[19] *See, e.g.*, *Walker*, 214 F.3d at 627, *abrogated on other grounds by Burlington*, 548 U.S. at 67 ("It is undisputed that the Glasfloss employee handbook contained an EEOC policy statement against discrimination, however, it appears that Glasfloss had not promulgated a complaint procedure specifically to address racial harassment." (footnote omitted)).

Here, although Boh Brothers maintained a broad nondiscrimination policy (the "EEO Statement"), it offered no specific guidance regarding sexual harassment. Rather, it offered generic statements such as "[a]ll personnel actions including, but not limited to, compensation, benefits, transfers, layoffs . . . , will be administered without regard to race, color, religion, disability, sex, or national origins" and "[a]ll working conditions will be maintained in a non-discriminatory manner."[20] As John F. Lipiani, Boh Brothers's in-house counsel,

---

[19] We emphasize that as employers' anti-harassment policies become increasingly comprehensive and well-implemented, a plaintiff's success will often turn on whether he promptly reported the harassing conduct. Indeed, the *Ellerth/Faragher* design "works only if employees report harassment promptly, earlier instead of later, and the sooner the better." *Baldwin*, 480 F.3d at 1307. As the Eighth Circuit has emphasized, "[o]nly when sexual harassment is exposed to scrutiny can it be eliminated; thus it makes sense to encourage victims of sexual harassment to come forward because . . . they are often the only ones, besides the perpetrators, who are aware of sexual harassment." *Adams v. O'Reilly Auto., Inc.*, 538 F.3d 926, 933 (8th Cir. 2008). Thus, where an employer implements suitable institutional policies and educational programs regarding sexual harassment, an employee who fails to take advantage of those policies cannot recover. *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1063 (10th Cir. 2009) ("It is undeniable that raising problems regarding sexual harassment can be uncomfortable for the employee, but if we were to allow an employee's subjective, ungrounded fears of unpleasantness or retaliation to alleviate an employee's reporting requirement, we would 'completely undermine Title VII's basic policy of encouraging forethought by employers and saving action by objecting employees.'" (quoting *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 268 (4th Cir. 2001))).

[20] Boh Brothers's generic policies are distinguishable from those we have held sufficient to satisfy the *Ellerth/Faragher* standard. *See, e.g.*, *Lauderdale*, 512 F.3d at 164 ("The TDCJ has satisfied the requirements of the first prong by virtue of its institutional policies and educational programs regarding sexual harassment. It is undisputed that Lauderdale received the requisite training and copies of the TDCJ's sexual-harassment policy statements. There is no allegation that the TDCJ's program, designed to avoid, report, and correct instances of

testified, Boh Brothers "did not put out a lot of definitions about anything." But even if the EEO Statement had included content relevant to sexual harassment—which it did not—Boh Brothers employees were not aware of the policy. Woods testified that he did not recall seeing any documents regarding discrimination at the time he was hired, and other employees indicated that they never read the notices that Boh Brothers posted in a "shack" on the work site.[21] Both Wolfe and Duckworth testified that they did not understand that conduct unmotivated by sexual desire could constitute sexual harassment.

Moreover, Boh Brothers's nondiscrimination policies offered employees no specific instructions regarding how to assert or investigate harassment complaints. The EEO Statement indicated: "The company has designated one of its officers, Mr. John F. Lipiani . . . as Equal Employment Opportunity Officer *to coordinate Company efforts and to advise and assist all personnel in implementing this policy*." This language focuses on policy implementation, but

---

sexual harassment, is insufficient or unreasonable."); *Hockman*, 407 F.3d at 329 ("Hockman received the Westward employee handbook containing the company's antiharrassment policy," which provided that "if the employee does not feel that her allegation is being handled satisfactorily by his or her supervisor, then she should report the incident directly to the Director of Human Resources"); *Wyatt*, 297 F.3d at 410 ("In concluding that Hunt satisfied the first prong, the court recited the undisputed facts that Hunt maintained a sexual harassment policy which it promulgated to all employees, including Wyatt, and that she knew that the policy instructed employees to report harassing incidents and to whom the report should be made. In addition, Hunt held regular meetings with its supervisory staff to train them on preventing sexual harassment."); *Casiano v. AT&T Corp.*, 213 F.3d 278, 286 (5th Cir. 2000) ("The summary judgment evidence adduced by AT&T regarding its extant procedures for encouraging and facilitating employee complaints of sexual harassment and for thereafter dealing with them swiftly and effectively is essentially uncontroverted and eschews the existence of a genuine dispute of material fact in that regard. AT&T's Personnel Guide, Employee Reference Guide, and 'Common Bond' all articulate the company policy that forbids sexual harassment and encourages both those who believe they are being harassed and those who witness harassment to notify supervisors as well as the 'applicable' AT&T EO/AA representative.").

[21] Surely an employee cannot defeat the *Ellerth/Faragher* affirmative defense by choosing to ignore his employer's well-communicated policies. But here, there is record evidence that Boh Brothers did not relay its nondiscrimination policies in an effective manner.

25

says nothing regarding how or to whom an employee should report a harassment claim. In addition, Boh Brothers failed to provide its supervisors with any guidance regarding how to investigate, document, and resolve harassment complaints once they were reported.[22] According to Lipiani, the company merely advised supervisors to call him with questions regarding how to investigate a complaint: "We didn't tell them exactly what to do. We told them to call when they needed help. To call me."

The record further demonstrates that Boh Brothers did little else to implement its nondiscrimination policies.[23] Duckworth, the general superintendent for Boh Brothers's Heavy Highway Department, testified that he received about five minutes of sexual-harassment training per year and did not understand that sexual harassment included conduct that was not motivated by sexual desire.[24] Despite his status as a supervisor, Wolfe testified that he did not receive any formal employment-discrimination training, other than receiving a general ethics code *after* Woods's harassment. According to Wolfe, he did not

---

[22] We have considered the existence of a written complaint procedure to be an important variable in the *Ellerth/Faragher* analysis. *See Walker*, 214 F.3d at 627 (noting that an employer's lack of a written complaint procedure weighed against granting the employer's motion for summary judgment); *cf. Harper v. City of Jackson Mun. Sch. Dist.*, 149 F. App'x 295, 300 (5th Cir. 2005) (unpublished but persuasive) (affirming summary judgment where an employee failed to avail herself of a complaint procedure that specifically provided that "an employee may bypass a harassing supervisor and complain about sexual harassment to the District's Title IX coordinator"); *Moayedi v. Compaq Computer Corp.*, 98 F. App'x 335, 338 (5th Cir. 2004) (unpublished but persuasive) (affirming summary judgment where an employee failed to reasonably avail herself of workplace harassment policies that she knew were in effect "because she had previously utilized them to stop a former harassing co-employee").

[23] Boh Brothers, a company of about 1,500 employees, had no human-resources department. Lipiani, the company's general counsel and designated EEO officer, conducted the five-minute sexual harassment training. At trial, Lipiani downplayed his knowledge of sexual harassment law. When asked, "[s]o you are the company's top in-house expert about sexual harassment, correct?" he responded, "I don't know if I'm the expert."

[24] It is worth noting that the three *Oncale* evidentiary routes—two of which have nothing to do with sexual desire—were recognized about eight years before the events in the instant matter came to pass. *See Oncale*, 523 U.S. at 80–81.

understand that his use of sex-based epithets, exposure of his genitals, and humping of Woods from behind either violated a company policy or constituted sexual harassment.

Beyond these policy failures, it is important that Woods's complaint to Duckworth resulted in what the jury reasonably could have viewed as a belated and cursory twenty-minute investigation, along with arguably poor treatment of the alleged victim vis-à-vis the alleged harasser.[25]  Duckworth took no notes and asked no questions during his meeting with Woods.  Upon hearing Woods's complaint, Duckworth sent Woods—the alleged harassment victim—home *with no pay* for three days because he was afraid that further problems would occur between the two men, leading Woods to assume that he had been fired.[26]

---

[25]  Although investigation is most easily seen as bearing upon the "prompt correction" aspect of *Ellerth/Faragher*'s first prong, it ultimately becomes a "prevention" measure as well. That is, prompt and thorough investigation serves as a deterrent to potential violators, and investigative findings may inform the employer's anti-harassment training program in an iterative improvement process. Here, the company's investigation pales in comparison to the prompt and effective responses we have noted in other cases. *See Williams v. Admin. Review Bd.*, 376 F.3d 471, 479 (5th Cir. 2004) ("Furthermore, once Pantex Management was informed of the hostile environment in March 1996 it acted swiftly to address the situation. Specifically, Pantex Management promptly assembled an investigative team to look into the alleged hostilities and offered recommendations on how the problem might be solved. After the investigative team completed its report, Pantex Management shut down the W55 program and required the entire staff to complete forty hours of training in effective human interaction and teamwork. In addition, the company conducted a line-by-line group-review of the program's safety procedures in order to ease tensions among employees. After the W55 program was restarted, Pantex ordered a follow-up investigation into the hostilities and found that hostilities had reduced significantly. Finally, Pantex Management ordered a root-causes analysis be performed, which resulted in the publication of written guidelines for supervisors on avoiding future hostility." (citations omitted)); *Moayedi*, 98 F. App'x at 338 ("We further agree with the district court's conclusion that Compaq acted reasonably and quickly in investigating the situation and fired Tumlinson within three weeks after the harassment was reported."); *Casiano*, 213 F.3d at 286 ("AT&T responded promptly and effectively: It suspended Valenzuela, the accused harasser, and dispatched two of its E.O. Specialists to conduct an in-depth investigation involving, among other things, interviews with Casiano, Valenzuela, and nine other workers.").

[26] Duckworth ultimately transferred Woods (not Wolfe) away from the job site, and he did so only after Woods called Carpenter seeking his job back.

Duckworth never informed Lipiani of the complaint and sought no advice regarding how to handle the matter. Indeed, a reasonable juror could have concluded that Duckworth waited for a few months before he even discussed the matter with Wolfe and Carpenter. When the meetings did occur, they lasted for approximately ten minutes each.

In contrast to his investigation of Woods's sexual harassment complaint, Duckworth investigated Woods's other allegation—that Wolfe misused company resources—in great detail. The company hired a private detective to investigate the allegations, resulting in 84.75 hours of work and two reports. As the EEOC emphasized in its opening statement: "Defendant does know how to investigate misconduct it cares about. . . . [W]hen defendant takes a complaint seriously, they investigate it seriously. They hired a private investigator to determine whether Wolfe was violating company policies. Yet, they spent no more than 20 minutes investigating when Mr. Woods complained about egregious sexual harassment."

Finally, Boh Brothers at least arguably failed to punish Wolfe for his harassment of Woods. Wolfe testified that he never received any "write-up" for his treatment of Woods. And although Wolfe eventually suffered a demotion, Duckworth never said that the demotion had to do with Wolfe's treatment of Woods. Rather, the conversation centered on "the safety issues and the suspicion of improprieties with the equipment and explaining to [Wolfe] that he wanted to handle himself in a more professional manner in regards to safety."

Considering these facts and drawing all reasonable inferences in the light most favorable to the verdict, we cannot say that no reasonable juror could have found that Boh Brothers failed to take reasonable measures to prevent and correct Woods's harassment.

Because the two prongs of the *Ellerth/Faragher* affirmative defense are conjunctive and there is sufficient evidence to support the jury's determination

on prong one, we need not consider prong two: whether Woods satisfied his duty to take full advantage of his employer's preventative and corrective measures.[27] We note that the evidence was thin on this prong: Woods's initial informal complaints to Carpenter made no reference to sexual harassment, and Woods did not raise the issue with Duckworth until months later, after he thought he had been fired for an unrelated incident.

Had Boh Brothers adopted suitable institutional policies and educational programs regarding sexual harassment, it may have avoided liability. Because a reasonable juror could have concluded that it did not, we uphold the jury's rejection of Boh Brothers's *Ellerth/Faragher* affirmative defense.[28]

**B.**

Having decided that the evidence supports the jury's liability finding, we turn next to whether it supports the jury's punitive damages award. A Title VII plaintiff may recover punitive damages upon proof that the defendant acted "with malice or with reckless indifference to the federally protected rights of an

---

[27] This requirement serves Title VII's purpose of encouraging "employees to report harassing conduct before it becomes severe or pervasive." *Ellerth*, 524 U.S. at 764; *see Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1307 (11th Cir. 2007) ("The genius of the *Faragher-Ellerth* plan is that the corresponding duties it places on employers and employees are designed to stop sexual harassment before it reaches the severe or pervasive stage amounting to discrimination in violation of Title VII.").

[28] While the *Ellerth/Faragher* affirmative defense offers meaningful protection to well-intentioned defendants who take preventative and corrective measures to address harassment in the workplace—it is not the only safety valve for defendants facing Title VII claims. Regardless of the existence of an internal complaint, Title VII itself requires an employee to file an EEOC claim in a timely and specific manner. For example, a plaintiff must file a complaint with the EEOC within 180 days of the alleged discriminatory act (or within 300 days if the plaintiff has initially instituted proceedings with a state or local agency with authority to grant relief). 42 U.S.C. § 2000e–5(e)(1). In addition, a Title VII plaintiff must exhaust all administrative remedies. *Tolbert v. United States*, 916 F.2d 245, 247 (5th Cir. 1990). "Ordinarily, an employee may not base a Title VII claim on an action that was not previously asserted in a formal charge of discrimination to the EEOC, or that could not 'reasonably be expected to grow out of the charge of discrimination.'" *Filer v. Donley*, 690 F.3d 643, 647 (5th Cir. 2012) (quoting *Pacheco v. Mineta*, 448 F.3d 783, 795 (5th Cir. 2006)).

aggrieved individual." 42 U.S.C. § 1981a(b)(1). This is a higher standard than the showing necessary for compensatory damages, satisfied in "only a subset of cases involving intentional discrimination." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999). Thus, "not every sufficient proof of pretext and discrimination is sufficient proof of malice or reckless indifference." *Hardin v. Caterpillar, Inc.*, 227 F.3d 268, 270 (5th Cir. 2000).[29] Moreover, even if particular agents acted with malice or reckless indifference, an employer may avoid vicarious punitive damages liability if it can show that it made good-faith efforts to comply with Title VII.[30] *Kolstad*, 527 U.S. at 545–46. Given these stringent standards, a plaintiff faces what our sister circuit has called a "formidable burden" in seeking punitive damages for employment discrimination. *Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.*, 439 F.3d 894,

---

[29] For example, several courts have held that a plaintiff is entitled to compensatory, but not punitive, damages, even where supervisors knew of discriminatory conduct and failed to afford employees a clear path to report the discrimination. *See, e.g.*, *Sturgill v. United Parcel Serv., Inc.*, 512 F.3d 1024, 1035 (8th Cir. 2008) (finding punitive damages inappropriate where the evidence showed no individual or corporate malice or reckless indifference to the company's Title VII obligations); *Splonge v. Shoney's, Inc.*, 97 F.3d 488, 490–91 (11th Cir. 1996) (denying punitive damages where higher management had constructive knowledge of discriminatory conduct); *Walters v. City of Atlanta*, 803 F.2d 1135, 1147 (11th Cir. 1986) (finding no evidence in the record to suggest reckless disregard for plaintiff's rights where plaintiff was treated courteously, but discriminated against, in his endeavor to obtain a directorship position); *Soderbeck v. Burnett Cnty.*, 752 F.2d 285, 290 (7th Cir. 1985) (finding punitive damages to be improper on the basis of discharge to make a supervisor's life easier, despite evidence in the record of discrimination stemming from political differences); *see also Dudley v. Wal-Mart Stores, Inc.*, 166 F.3d 1317, 1323 (11th Cir. 1999) (emphasizing that punitive damages are "to punish those who have actually done wrong and not those who have liability by implication of law only").

[30] Whether an employer acts in "good faith" is a distinct inquiry from whether an employer established the *Ellerth/Faragher* affirmative defense. *See Harris v. L & L Wings, Inc.*, 132 F.3d 978, 983 (4th Cir. 1997) (illustrating that, in some cases, the existence of a written policy against discrimination "operat[es] as a total bar to employer liability for punitive damages"); *see also Scrivner v. Socorro Indep. Sch. Dist.*, 169 F.3d 969, 971–72 (5th Cir. 1999) (finding bad faith where a teacher thwarted the purposes of Title VII by misleading investigators). Put differently, a policy adopted in good faith can be unreasonable or unsuitable to the circumstances, such that the defendant can satisfy the *Kolstad* good faith inquiry, but not prong one of the *Ellerth/Faragher* defense.

903 (8th Cir. 2006) (internal quotation marks omitted).

Ultimately, the terms "malice" and "reckless indifference" "focus on the actor's state of mind." *Kolstad*, 527 U.S. at 535. Both "pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Id.* Thus, the defendant employer "must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable for punitive damages." *Id.* at 536. Even intentional discrimination may not meet this standard where the employer is "unaware of the relevant federal prohibition" or "discriminates with the distinct belief that its discrimination is lawful." *Id.* at 537. For example, punitive damages may not be appropriate where the underlying theory of discrimination is "novel or otherwise poorly recognized." *Id.* at 536–37.

Here, although we affirm the jury's finding that Boh Brothers engaged in intentional discrimination, the EEOC cannot meet the higher burden to show that it did so "in the face of a *perceived* risk" that its actions would "violate federal law." *See id.* at 536 (emphasis added). In investigating Woods's complaint, Duckworth's understanding was that sexual harassment was illegal only if it involved "unwanted advances" or "sexual desire." When asked: "You didn't think that Mr. Wolfe was sexually harassing Mr. Woods because you don't think that Mr. Wolfe has any interest in guys; correct?" Duckworth answered: "Yes." Likewise, when the EEOC asked Wolfe: "You never learned that it was against the law for a male supervisor to sexually harass a male employee until after Mr. Woods left Boh Brothers; is that correct?" Wolfe answered: "That's correct." When asked: "Your current understanding about the company's policies on sexual harassment is that same-sex harassment only happens where a male supervisor abuses an employee because the employee is a homosexual; is that right?" Wolfe answered: "That's what I thought at the time." The EEOC offered nothing to rebut this testimony. Thus, the uncontroverted evidence shows that

31

neither Wolfe nor Duckworth subjectively understood that male-on-male sexual harassment, based on something other than sexual desire, was sufficient to violate federal law.

Although the federal law at issue in this case—most importantly, *Price Waterhouse* and *Oncale*—is not new, we had not directly addressed whether a plaintiff could rely on evidence of gender-stereotyping in a same-sex discrimination case at the time of Wolfe's harassment. Thus, while Wolfe and Duckworth's subjective understandings of same-sex harassment, and Boh Brothers's failure to train its employees regarding the issue, may have been ill-advised, it was not malicious or recklessly indifferent.[31]   Because the uncontroverted evidence shows that Boh Brothers did not subjectively perceive a risk of violation of federal law, we conclude that Boh Brothers was entitled to judgment as a matter of law overturning the jury's punitive-damages award.

We note, however, that this holding upsets the district court's compensatory-damages award. The jury awarded a total of $451,000 in damages: $201,000 compensatory[32] and $250,000 punitive. But 42 U.S.C. § 1981a(b)(3)(D) caps the available damages at $300,000.[33] To comply with this cap, the district court reduced the EEOC's compensatory damages to $50,000 and left the punitive damages intact, resulting in a $300,000 judgment against

---

[31] *See Jeffries v. Wal-Mart Stores, Inc.*, 15 F. App'x 252, 269 (6th Cir. 2001) (unpublished but persuasive) ("Plaintiff has provided no evidence that Defendant's employees knew of the federal prohibition against retaliation, or the state prohibitions for that matter, and none of the actions taken by Defendant's employees could lead a reasonable juror to infer 'evil intent.'").

[32] The jury awarded $1,000 in back pay and $200,000 in mental anguish damages.

[33] Specifically, 42 U.S.C. § 1981a(b)(3)(D) caps the sum of "the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses" and the "amount of punitive damages awarded under this section" at $300,000 for companies with "more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year."

Boh Brothers.

It appears from the record that the district court decided to reduce the EEOC's compensatory damages, rather than its punitive damages, for two reasons.  First, the EEOC advocated this approach based on *Abner v. Kansas City Southern Railroad Co.*, 513 F.3d 154, 164 (5th Cir. 2008), which it relied on for the proposition that the district court lacked discretion to reduce a punitive-damages award that fell below the statutory cap.[34]  Second, the district court expressed some hesitation regarding the jury's compensatory-damages award.  On this record, it is unclear whether the district court would have awarded the EEOC the entire $201,000 compensatory-damages amount absent the statutory-damages cap.  Accordingly, we remand to the district court to consider in the first instance whether the evidence is sufficient to support the jury's $201,000 compensatory damages finding.  Having presided over the trial and heard the evidence directly, the district court judge is in the best position to assess this issue.[35]

---

[34] Boh Brothers disputed the EEOC's interpretation of *Abner* at the post-trial conference.  After the district court issued its judgment in this case, we affirmed a district court's use of its discretion to grant a remittur of a Title VII punitive damages award that fell below the statutory cap.  *EEOC v. Serv. Temps Inc.*, 679 F.3d 323, 337–38 (5th Cir. 2012).

[35] Judge DeMoss's dissent emphasizes that the EEOC did not challenge the reduction of its compensatory damages award on appeal.  But, of course, the EEOC could not appeal the issue.  It is "more than well-settled that a party cannot appeal from a judgment unless 'aggrieved' by  it." *In Re Sims*, 994 F.2d 210, 214 (5th Cir. 1993) (citation omitted).  "Simply stated, a party who has obtained a judgment in his favor, *granting the relief sought*, is not aggrieved by it." *Id.* (emphasis added).  Indeed, we have emphasized that a "cross-appeal filed for the sole purpose of advancing additional arguments in support of a judgment is worse than unnecessary, because it disrupts the briefing schedule, increases the number (and usually the length) of briefs, and tends to confuse the issues." *Id.* (citation and internal quotation marks omitted).

Here, the district court's judgment awarded the EEOC all of the relief allowable under the statute; accordingly, it had no grounds to appeal the *manner* in which the court reached the $300,000 figure. *See, e.g.*, *Lindheimer v. Ill. Bell Tel. Co.*, 292 U.S. 151, 176 (1934) (dismissing appeal of prevailing party); *Ward v. Santa Fe Indep. Sch. Dist.*, 393 F.3d 599, 603 (5th Cir. 2004) (finding that the plaintiffs lacked standing because they "received all of the relief they requested and cannot demonstrate any adverse effect resulting from the

We turn finally to Boh Brothers's last argument: that the district court erred in awarding the EEOC injunctive relief and that, in any event, the scope of the injunction was too broad.

## C.

As Boh Brothers recognizes, injunctive relief is mandatory in the wake of a Title VII violation "absent clear and convincing proof of no reasonable probability of further noncompliance with the law." *Serv. Temps Inc.*, 679 F.3d at 338 n.51 (quoting *James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 354 (5th Cir. 1977) and citing *EEOC v. Rogers Bros., Inc.*, 470 F.2d 965, 966–67 (5th Cir. 1972)). We review the scope of the injunction for abuse of discretion. *Id.* at 338.

Here, the district court held that Boh Brothers failed to demonstrate, by clear and convincing evidence, that future violations of Title VII were not reasonably likely to occur. Considering the evidence discussed in Sections III and IV(A) above, we agree. Although Boh Brothers complains that the injunction is too broad, it does not specifically articulate *how*. That is, Boh Brothers does not explain which particular provisions of the injunction are excessive and unnecessary to prevent future violations. Moreover, as the district court noted, Boh Brothers offered "no sworn testimony to support its claims" that the injunction was unreasonable and overly burdensome. Thus, on this record, Boh Brothers has not met its burden to show that the district court abused its discretion with respect to the scope of the injunction. The injunction is reasonably tailored to address deficiencies in Boh Brothers's sexual harassment policies, inform and train employees regarding the relevant law, and

judgment"); *Fountain v. Bd. of Trs. of Biloxi Mun. Separate Sch. Dist.*, 226 F.3d 643 (5th Cir. 2000) (per curiam) ("Only the party aggrieved has standing to appeal."). Because our decision upsets the EEOC's total damages award, the EEOC is now in a different position. We think it best to remand and allow both parties to fully brief and argue whether the evidence is sufficient to support the jury's compensatory damages award.

prevent similar conduct from recurring.  Accordingly, we affirm the issuance and content of the injunction.

## V.

We will overturn a jury verdict on sufficiency grounds only in the rare circumstance that the contrary facts and inferences are so strong that a reasonable person could not reach the same conclusion.  Applying this bedrock principle here, we AFFIRM in part, VACATE in part, and REMAND for further proceedings consistent with this opinion.

E. GRADY JOLLY, Circuit Judge, dissenting, joined by JONES, SMITH, DeMOSS, CLEMENT, and OWEN, Circuit Judges.

Let me first acknowledge that the facts and language in this case, which occurred in an all-male workforce on an ironworker construction site, are not for tender ears. The vulgarities can cast turmoil in a strong stomach, but that does not mean that the laws of the United States have been violated, and it does not require Title VII and the EEOC to serve as federal enforcer of clean talk in a single sex workforce.

The majority notes that the EEOC "may rely on evidence that Wolfe viewed Woods as insufficiently masculine to prove its Title VII claim." That may be true, but the fatal vacuum in the majority's reasoning is that the EEOC, in fact, produced no evidence that Wolfe believed Woods was not a "manly man." This lack of regard for the very foundational requirement that some *reason* for alleged sexual discrimination be presented allows this alleged same-sex stereotyping case to untether Title VII from its current mooring in sexual discrimination. Its application now veers from the realm of valid action against actual *sexual* harassment to a new world, in which Title VII prevents not only sexual harassment, but also myriad other undesirable conduct—regardless of whether that conduct, in fact, even resembles *sexual discrimination*. Accordingly, I respectfully dissent.

I.

While the Supreme Court has made clear that same-sex sexual harassment claims are cognizable under Title VII, it has further acknowledged that proving such claims is more demanding and cumbersome than proving traditional opposite-sex sexual harassment claims. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998). Thus, in *Oncale* the Court recognized that there must be some identifiable basis for inferring that an alleged harasser is intending to discriminate against a victim on the basis of his

or her sex in same-sex discrimination cases. *Id.* For instance, the Court observed that same-sex harassment claims could be viable when there is credible evidence a harasser is homosexual, or when it has been made clear "the harasser is motivated by general hostility to the presence of [members of his or her same sex] in the workplace," or when there is "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." *Id.* at 80. Each of these examples is a mechanism for ascertaining an intent to discriminate based upon sex. It is compelling, in the first instance, that none of these factors are present in this case.

But regardless of whether there are other methods for making this determination, the EEOC proffered no basis for inferring discriminatory intent based upon Woods's sex—subjective or objective. Rather, it moves quickly from asserting that other evidentiary paths are available to a conclusion that, because Wolfe targeted certain words and acts at Woods, Wolfe's mal intent to sexually discriminate against Woods was proved. This line of reasoning completely abdicates the burden prescribed to plaintiffs in same-sex sexual discrimination cases by the Supreme Court in *Oncale*—which is not simply to assert the basis for the inference of harassment based upon sex, but to further prove the truth of that assertion. The *Oncale* Court specifically held "[t]he same chain of inference" present in male-female sexual harassment claims—i.e., the assumption that certain "proposals would not have been made to someone of the same sex"—is available in same-sex sexual harassment cases only if an additional step is taken to illuminate the basis of the inference. *Id.* at 80. Unlike opposite sex Title VII claims, therefore, in same-sex suits a plaintiff must elucidate and prove the premise of his assertion that the harassment is *because of* sex—it is not assumed automatically.

In this case, the EEOC's proffered premise is that Wolfe subjectively believed Woods was somehow not "manly." But the only evidence the EEOC

37

provided supporting this premise related to Woods's use of Wet Ones; Wolfe himself testified that, aside from this, he emphatically did not believe or consider Woods feminine, but, instead, Woods was "an iron worker just like the rest of [t]hem." And Woods himself offered no other explanation as to why he believed Wolfe was sexually harassing him, as opposed to simply taunting him as Wolfe did every other iron worker on the all-male job site. Indeed, Woods never stated that he felt Wolfe called him names and behaved crudely with him because Wolfe believed Woods did not conform to gender norms.[1] Thus, even the plaintiff did not contend his alleged harasser harassed him because he did not act "manly."

Moreover, there is simply no evidence, garnered from Woods, Wolfe, or any of the other men who testified, that Woods failed objectively to conform to traditional "male gender norms." The majority notes that "[w]e do not require a plaintiff to prop up his employer's subjective discriminatory animus by proving that it was rooted in some objective truth." In other cases this assertion may be true. When, however, the subjective discriminatory animus of the employer is itself in question, objective evidence may be necessary to demonstrate the presence or absence of such an intent. *See, e.g.*, *Medina v. Income Support Div., New Mexico*, 413 F.3d 1131, 1135 (10th Cir. 2005) (finding no sexual harassment based upon gender stereotyping when "there [wa]s no evidence . . . that [the plaintiff] did not dress or behave like a stereotypical woman"). If a victim possesses no characteristics, exhibited or unexhibited, of nonconformance with gender stereotypes, then there would appear to be no basis for an alleged

---

[1] Woods testified he felt harassed by Wolfe, but never offered an explanation as to why he felt this was *sexual* discrimination. At one point during his testimony, Woods's lawyer asked him in what way he felt Wolfe treated him differently than Wolfe treated others on site, and Woods's answer was that "he treated them more like you're supposed to treat a grown man." USCA5 at 1746. But this suggests only that Wolfe's conduct was itself adult-to-juvenile conduct. Nowhere in his testimony did Woods state he felt Wolfe harassed him because Wolfe thought he did not act "manly."

harasser to possess a subjective intent to discriminate against that victim because of nonconformance. And in cases such as this, where the alleged harasser does not consider the victim to be unmanly—and even the victim does not testify otherwise—and the alleged harasser further treats the victim with the same or similar disrespect with which he treats his other coworkers, we are left without anything tethering a claim of discrimination because of sex to the realities of the workplace. To reach any other conclusion is to say that when a supervisor persists in referring to an unquestionably manly man as a sissy, the laws of the United States have been broken, requiring the full force of the United States executive and judiciary to descend upon some small business and extract hundreds of thousands of dollars in fees and damages from its till. Such a result is simply at odds with Title VII, which is only violated in cases of discrimination based upon the victim's sex.[2]

The majority isolates from its context the language and conduct of Wolfe, and seizes upon it as reflecting a subjective intent to discriminate on the basis of Woods' sex, saying that the harassing out-of-context words and conduct, "lend themselves to a reasonable inference on the part of the jury that Wolfe viewed Woods as insufficiently masculine." That is to say, the majority relies on the harassment, in and of itself, as a substitute for actual evidence reflecting a subjective intent of Wolfe to engage in sex discrimination against Woods – completely ignoring the all male iron worker environment where it occurred. The majority thus engages in a distraction from the proper legal analysis by treating this case as if it were sexual harassment between male and female when the inference of sex discrimination may be presumed by words and

---

[2] Thus, to reiterate, reference to the objective facts of this case is relevant simply to show that there was no basis from which a jury could have drawn a conclusion of intentional discrimination based upon same-sex stereotyping.

conduct.[3]  In same-sex sexual harassment cases, particularly in an all-male workforce where rowdy language is commonplace, the reason for harassment (i.e. whether it is because of <u>sex</u>) must be distilled and proved by the plaintiff, a showing which the majority has utterly failed in making.  The majority should call it for what it is: immature and gutter behavior between and among male coworkers.  And then drop it.

It is especially inappropriate in this case to assume that Wolfe's use of words like "pu--y" and "fa--ot" necessarily connoted a desire to sexually discriminate, because all of the evidence indicates Wolfe used these and similar words towards the other men on site on a daily basis.  In fact, the record is replete with testimony that Wolfe was vulgar with everyone on site, aiming derogatory terms with sexual innuendoes at each of them, exposing himself to them, and pretending to "hump" several men on site.  And while Wolfe was unquestionably the crudest ironworker on the site, the evidence indicates all the men were generally more vulgar here than they would have been in a mixed-sex society, and that such sexually-charged words were bandied about regularly.  The EEOC has identified no basis for presuming that Wolfe directed these words and actions at Woods, particularly, or at any of the other ironworkers for that matter,  out of a subjective intent to sexually discriminate against him or them.  This failure should end the discussion and the case.

Indeed, the case the majority cites for the proposition that words alone demonstrate Wolfe's subjective intent itself belies the weakness of its application here.  In *Nichols v. Azteca Restaurant Enterprises, Inc.*, 256 F.3d 864 (9th Cir.

---

[3] Even in opposite-sex cases, this assumption is not always valid—context is immensely important in Title VII cases.  For example, the Seventh Circuit found the term "'sick bitch'—and . . . the other verbal abuse, and the obscene gesture that [the defendant] directed toward [the plaintiff]—was, in context, not a sex- or gender-related term." *Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1167 (7th Cir. 1996), *abrogated in part on other grounds*, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

2001), the court found "systematic abuse directed at Sanchez reflected a belief that Sanchez did not act as a man should act," when several of Sanchez's coworkers at the restaurant attacked him—and only him—for walking and carrying his tray "like a woman," ridiculed him for not having sexual intercourse with a waitress who was his friend, frequently referred to him as "she" or "her," and directed vulgar names at him that were "cast in female terms." *Id.* at 874. The court then concluded that all of this verbal abuse was closely linked to gender—it did not rely solely upon the names Sanchez's coworkers called him.

Here, quite to the contrary. The record shows, as we have pointed out, that Wolfe was vulgar and used such names with all the men on site, and the EEOC points only to Woods's use of Wet Ones as the basis for presuming he "did not act as a man should act." The patent weakness of the EEOC's attempt to use this singular example of Woods's as the premise for a lawsuit alleging violations of the laws of the United States—and as the sole support for a several hundred thousand dollar verdict—is underscored by the fact that no other circuit has found a Title VII violation on such piddling evidence. As just noted, the Ninth Circuit reached a conclusion that same-sex sexual harassment on the basis of gender stereotypes occurred in the face of far more compelling facts—it is difficult to dispute that a man's coworkers at a restaurant do not think he is "manly" when they single him out, tell him explicitly that he "carr[ies] his tray 'like a woman,'" mock his lack of sexual activity with women, and continuously call him "she" or "her." *Id.* And, to be sure, the Tenth Circuit rejected a claim of sexual discrimination in a setting similar to the one now before us. *Medina*, 413 F.3d 1131. In *Medina*, the court found that the plaintiff failed to demonstrate she was sexually discriminated against because of her failure to comport with gender stereotypes when "there [wa]s no evidence—and no claim—that [the plaintiff] did not dress or behave like a stereotypical woman. *Id.* at 1135.

Similarly here, there is no evidence Woods did not behave like a stereotypical man—and Woods never claimed that he felt Wolfe discriminated against him because Wolfe believed that he was not manly. The EEOC has demonstrated nothing more than: Wolfe asserted a single act of Woods's that was not manly; and, secondly, that Wolfe was cruder to Woods than he was to most other men on site; but it has in no way demonstrated that this additional crudeness derived from a subjective intent to sexually discriminate against Woods anymore than it did Wolfe's other "victims." This superficial demonstration, when placed in the context of this workplace, may suggest that Wolfe did not like Woods; it utterly fails to speak to the reason for such dislike. *See, e.g.*, *Galloway*, 78 F.3d at 1168 (finding, in context, that "there would not be an automatic inference from his use of the word 'bitch' that his abuse of a woman was motivated by her gender rather than by a personal dislike unrelated to gender").

Furthermore, that the record makes clear Wolfe engaged in materially similar, vulgar conduct with most every other employee on the work site means—on the very same evidence supplied in this case—each of these men can establish a successful claim for sexual harassment. That is, unless there is some motive of Wolfe's peculiar to Woods. But if such a motive existed, the EEOC has neither claimed nor demonstrated it. Nor does the majority illuminate what evidence indicates Wolfe's intent toward Woods was any different. Without evidence of this motive, there is nothing supporting the notion that Wolfe sexually discriminated against Woods alone, as opposed to each and every man with whom he crudely interacted.

Finally, the majority opinion takes no account of the overall social context in which this case occurred. It is important to the case, and to any conclusion of sexual harassment, that these actions occurred in an all-male environment and on the construction site. This setting is customarily vulgar and crude. And

the Supreme Court has clearly and repeatedly held that "an appropriate sensitivity to social context," and a recognition that the same actions taken on "the field" versus in the office are importantly different, are considerations preventing Title VII from mutating into an all-encompassing code of civility. *Oncale*, 523 U.S. at 81. In fact, the Court explicitly found that "[t]he real social impact of workplace behavior depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id*. at 81-82. Despite this clear admonition, the majority quotes extensively from the record and recounts various actions in which Wolfe engaged without ever taking account of the environment surrounding these events, or explaining how behavior occurring on and characteristic of the construction site can constitute *sexual* harassment.

## II.

The majority upholds a plaintiff's claim of same-sex sexual harassment based upon gender stereotyping without any evidence that gender stereotyping actually occurred. The implication of this holding is that certain vulgarities and crude behavior—including those occurring in an all-male environment on the construction site—necessarily constitute illegal sexual harassment in violation of the laws of the United States, even when no reason exists for presuming these words and acts are motivated by a desire to discriminate based upon sex. Finding this holding to be a gross extension of what were once sensible limitations upon Title VII liability, I respectfully dissent.[4]

---

[4] As a final note, I would add that the majority is also wrong regarding the *Ellerth/Faragher* affirmative defense and the issue of injunctive relief. With respect to the affirmative defense, Woods specifically admitted that he knew he could complain about Wolfe's behavior, but that he *never* did so until the occasion when management immediately responded to his complaint by reassigning him to another work site. USCA5 at 1788-89. Furthermore, the injunctive relief awarded by the district court was totally inappropriate. This case involved one supervisor and one complaint by one individual—who, as just stated,

No. 11-30770

---

failed to make the company aware of any harassment until after he was taken off the site, and who, along with his alleged harasser, is no longer with the company—and this company has had no other meritorious complaint of sexual harassment in its forty-year history. The district court's imposition of extensive and impractical remedies in this case is thus an overreaction to the conduct of a single supervisor, now discharged, whose conduct lasted a few months in the context of forty years without a single incident.

EDITH H. JONES, Circuit Judge, dissenting, joined by JOLLY, SMITH, DeMOSS, CLEMENT, and OWEN, Circuit Judges.


Bad facts often inspire bad law. And sex talk doesn't always mean that sex is involved. Supervisor Wolfe's conduct was, indeed, bad, boorish and juvenile. What elevated grossness in an all-male environment to a Title VII claim of employment discrimination "because of" Woods's "sex"? The EEOC had to offer an expert witness to explain its case. That should tell us something. In Title VII opposite-sex cases, we need no expert to explain the employment implications of sexual come-ons, put-downs, pat-downs, and stereotyping.[1] Here, an all-male, heterosexual crew was performing a "macho" job. We know that men behave differently when women aren't around (as do women surrounded by women). No physical touching, threats, sexual *quid pro quo,* or employment retaliation was imposed on the plaintiff. Yet without such hard proof of sexually-motivated harassment, the majority affirms a substantial sexual harassment verdict for Kerry Woods. As Judge Jolly's dissent notes, based on this decision, every one of Woods's co-workers could have filed suit against Boh Brothers.

This decision, however, goes further than its application to single-sex workplaces. EEOC claimed to advocate that there is "no coarse workplace exclusion" from Title VII, especially for classically male locales like the oil patch. What it has persuaded the majority to adopt is the disturbing proposition that, to avoid exposure to Title VII liability, employers must purge every workplace of speech and gestures that might be viewed in any way as tokens of sex discrimination.[2] Consider the attached memorandum, "Etiquette for Ironworkers," which suggests how prudent employers may respond to the

---

[1] This dissent does not address or question in any way standards for racial harassment under Title VII.

[2] EEOC counsel acknowledged during en banc oral argument that Prime Minister Margaret Thatcher would have violated Title VII because she was known for chastising her male cabinet ministers, asking whether there was a "real" man among them.

majority decision. Today's holding shifts Title VII toward liability based on offending speech alone, without tether, as Judge Jolly notes, to discrimination "because of" sex. Vulgar speech is ubiquitous in today's culture and is everywhere else protected from government diktat by the First Amendment. In the workplace, however, vulgar or offensive speech may now inspire litigation that costs employers hundreds of thousands of dollars to defend; may forever stigmatize the "harasser" whose principal crime was bad taste; may be outlawed by workplace sensitivity training; and may subject workplaces to intrusive, court-ordered injunctive monitoring. In essence, this judgment portends a government-compelled workplace speech code.[3]   I therefore dissent.

Judge Jolly's excellent dissent makes clear that the majority succumbed to this theory in a dubious case. I concur in his dissent and in Judge DeMoss's observation that on remand, the district court need not recalculate the damages verdict to render the elimination of punitive damages a pyrrhic victory.

This dissent will address additional reasons why Wolfe's misconduct was not actionable "gender stereotyping" sexual harassment; the erroneous introduction of expert testimony to support EEOC's case; and the employer's *Ellerth/Faragher* defense.

## 1.    No Actionable Sex Harassment.

Judgment as a matter of law should have been granted, because there is insufficient evidence that Wolfe harassed Woods "because of" Woods's sex.

The verdict for Woods cannot be justified simply by adding *Price*

---

[3] It is unsurprising that the EEOC should pursue a Title VII case with this ultimate result. The federal government recently promulgated procedures for government-subsidized universities that will dramatically curtail free speech on campus in the name of alleviating sex discrimination. *See, e.g.*, Walter Olson, *Sentence First, Verdict Afterward*, COMMENTARY MAGAZINE, July 2013; Wendy Kaminer, *No Sex Talk Allowed*, The ATLANTIC, May 16, 2013, www.theatlantic.com/sexes/archive/2013/05/no-sex-talk-allowed/275782. Courts have struck down similar campus speech codes for violating the First Amendment. *DeJohn v. Temple Univ.*, 537 F.3d 301, 313-20 (3d Cir. 2008).

*Waterhouse's* plurality theory of "gender stereotyping" on top of *Oncale*. *Price Waterhouse* has become the talisman for claims of gender stereotyping.[4] I do not dispute that other circuits have recognized this as a specific form of sexual harassment discrimination under Title VII. It is important to recall, though, that *Price Waterhouse* dealt with a concrete adverse employment action, the denial of partnership in an accounting firm, and the partners evaluated the plaintiff based on well-known indicia of the stereotyping of female appearance and behavior.[5] Their overt stereotyping was evidence of a motivation to discriminate against the plaintiff because she was a non-stereotypical female. Here, unlike in *Price Waterhouse*, there is no overt stereotyping—unless epithets like "princess," "fairy," and "queer" used among avowedly heterosexual men may be inferred to connote gender stereotyping.

*Oncale*, moreover, does not require affirmance of this verdict. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S. Ct. 998 (1998). In fact, the Supreme Court went out of its way—unanimously and repeatedly—stressing that Title VII cannot impose a "code of civility" on the American workplace; that "common sense, and an appropriate sensitivity to context" must prevail in courts and juries to determine what constitutes same gender harassment. This is not to contend that the three examples of same-sex harassment offered by the Court were exclusive. But proof of same-sex harassment on any other grounds has to

---

[4] The *Price Waterhouse* plurality's discussion of the "legal relevance" of sex stereotyping does not create a claim for a Title VII violation. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251, 109 S. Ct. 1775, 1791 (1989). Even if it attempted to do so, the plurality opinion is not controlling. Moreover, the plurality opinion uses sex stereotyping remarks by the male decision-makers only as evidence that they were motivated to discriminate against the female plaintiff. *Id.* The other members of the court agreed to the relevance of the remarks for that limited purpose alone. *See, e.g.*, 490 U.S. at 294, 109 S. Ct. at 1813 (Kennedy, J., dissenting) ("Title VII creates no independent cause of action for sex stereotyping. '[Such] [e]vidence . . . is, of course, quite relevant to the question of discriminatory intent.").

[5] *See, e.g.*, *Price Waterhouse*, 490 U.S. at 234-37, 109 S. Ct. at 1782-83.

take account of the overall social context of the behavior, including "relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." 523 U.S. at 82, 118 S. Ct. at 1003. Hence, the Court emphasized, behavior in the locker room is not the same as when men engage in similar behavior with women. Finally, an employee "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimina[tion]* . . . because of . . . sex.'" *Oncale*, 523 U.S. at 81, 118 S. Ct. at 1002 (quoting Title VII) (emphasis in original).

Context, and the nature of the misconduct, are everything in a same-sex environment. Case law holds that sex talk does not necessarily connote actionable harassment "because of sex" even in opposite-sex harassment cases. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 2283 (1998) ("simple teasing, offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'"); *see also*, *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999) (finding that "each comment made by [harasser was] the equivalent of a mere utterance of an epithet that engender offensive feelings," but did not suffice to survive summary judgment) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993) (internal citations and quotations omitted)). Hence, in a same-sex case like this one, it makes no sense at all to affirm a verdict that a heterosexual male "discriminated against" another heterosexual male by calling him names, which both know not to be true by conduct or appearance. Name-calling may be bullying, but it isn't discrimination because the victim is a male. Contrary to common sense, the majority opinion says that "[w]e do not require a plaintiff to prop up his employer's subjective discriminatory animus by proving that it was rooted in some objective truth [about the plaintiff]." Perhaps dispensing with "objective truth" would be acceptable in opposite-sex discrimination cases: everyone knows

what such stereotyping is and how it functions to demean a victim and place the victim at a disadvantage in the workplace.[6] In an all-male workplace, however, we move into *Oncale* territory, where, I would contend, crude sexual epithets are ubiquitous to the point of triviality. They cannot alone support an inference of the harasser's motivation to discriminate "because of" sex. Recognizing this contextual ambiguity, all of the gender stereotyping same-sex harassment cases to date have regarded the non-gender-conforming behavior or appearance of the plaintiff (or the harasser) as crucial to raising an inference of illegal discrimination. This "objective proof" was necessary to support an inference of discrimination "because of" sex. Not to require such proof in these same-sex cases is to foster an entirely protean, standardless cause of action.

Woods did not testify he was singled out because he appeared or acted unmanly. This workplace was rife with all the workers' sex-charged epithets, and Wolfe exhibited gross and obscene conduct toward several of them (including Wolfe's "mooning" many other people near the worksite). Woods contends only that he was singled out for humiliation.[7] The epithets and obscene gestures and the plaintiff's use of "Wet Ones" handwipes are the majority's only support for Wolfe's subjective discriminatory mindset.[8] The epithets, though obnoxious, are not ordinarily regarded as "because of" sex; "princess," "fairy," even "faggot," are simply epithets, like "bitch," or "son of a bitch." By the way,

---

[6] In *Price Waterhouse*, for instance, the plaintiff did not dress or act according to the male partners' steretyped notions of femininity. The Supreme Court unanimously characterized the evidence as "direct and substantial proof that an impermissible motive was relied upon." *Price Waterhouse*, 490 U.S. at 290, 109 S. Ct. at 1812 (Kennedy, J. dissenting).

[7] Unfortunately, while it extensively quotes Wolfe's testimony, the majority opinion curiously omits (via carefully placed ellipses) the parts relating to the generally crude atmosphere at the worksite. For instance, that Wolfe called his own son, who was also working there, a "queer," is omitted.

[8] Comparable behavior in the presence of women, of course, would carry entirely different connotations.

Wolfe also repeatedly referred to Woods as an "MF," which is hardly homophobic, and he made fun of Woods's sexual relations *with his wife. Cf. Galloway v. Gen. Motors Serv. Parts Operations*, 78 F.3d 1164 (7th Cir. 1996)(calling a woman "sick bitch" repeatedly and along with obscene gestures was not, *in context*, sexual harassment). Allowing words and gestures alone to support an inference of same-sex gender stereotyping harassment is a truly novel holding.

All other courts to date have recognized that because of the different context inherent in workplace interactions between members of the same sex, sexual epithets alone are insufficient to raise a legitimate inference of gender-stereotyping harassment discrimination. Confronted with a Title VII case involving the use of even more extreme sexual epithets between two heterosexual men, the Seventh Circuit affirmed a grant of summary judgment. *Johnson v. Hondo, Inc.*, 125 F.3d 408, 412-13 (7th Cir. 1997). The court explained that expressions such as 'f*** me,' 'kiss my a**,' and 's**k my d**k,' which were repeatedly used against the plaintiff, "are commonplace in certain circles, and more often than not, when these expressions are used (particularly when uttered by men speaking to other men), their use has no connection whatsoever with the sexual acts to which they make reference." *Id*. at 412. The court concluded,

> In this case, the plaintiff's sole evidence bearing on the gender-based nature of Hicks' provocations is the facially sexual content of Hicks' remarks. Upon scrutiny, however, no reasonable factfinder could conclude that Hicks directed his vulgar comments at Johnson because of his gender. It appears plain on the record as a whole that Hicks' remarks to Johnson were nothing other than vulgar provocations having no causal relationship to Johnson's gender as a male.

*Id*. at 413. *See also Wasek v. Arrow Energy Servs., Inc.,* 682 F.3d 463, 468 (6th Cir. 2012) (holding that male plaintiff's hostile work environment claim failed

because there was no credible evidence that he was not heterosexual); *EEOC v. McPherson Cos., Inc.,* 914 F.Supp.2d 1234, 1243–45 (N.D. Ala. 2012) (holding that male plaintiff failed to assert a sexual harassment claim when there was no evidence that he failed to conform to male stereotypes).

The only objective way for courts or juries to grasp that a same-sex harasser is acting "because of" the victim's sex is for the victim (or the harasser) visibly not to conform to gender stereotype. An insightful opinion from the Second Circuit, summarizing the case law, concluded that non-gender-conforming behavior or appearance are preconditions to a gender stereotyping Title VII claim. *Dawson v. Bumble & Bumble*, 398 F.3d 211, 221 (2d Cir. 2005) (Pooler, J.); *see also Lewis v. Heartland Inns of Am., LLC*, 591 F.3d 1033, 1036 (8th Cir. 2010)(Murphy, J.)(evidence supported inference of gender stereotyping where female plaintiff had been mistaken for a male, described herself as "slightly more masculine," wore men's button down shirts and slacks, avoided makeup, and had short hair).  Even the plaintiff in *Price Waterhouse* evidently did not "conform" objectively to stereotypical female appearance and behavior. The majority opinion cites not a single case to the contrary.[9]

In an effort to prop up its holding, the majority likens this case to *Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803 (5th Cir. 1996), which

---

[9] *See also Prowel v. Wise Bus. Forms, Inc.,* 579 F.3d 285, 291–92 (3d Cir. 2009) (concluding that a male plaintiff who acknowledged that he speaks with a high voice, walks in an effeminate manner, and sits "the way a woman would sit" adduced sufficient evidence to submit his sex discrimination claim to a jury); *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 764 (6th Cir. 2006) ("Rather, his claim fails because Vickers has failed to allege that he did not conform to traditional gender stereotypes in any observable way at work."); *Medina v. Income Support Div., New Mexico*, 413 F.3d 1131, 1135 (10th Cir. 2005) (finding no sexual harassment based upon gender stereotyping when "there [wa]s no evidence . . . that [the plaintiff] did not dress or behave like a stereotypical woman"); *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 874 (9th Cir. 2001) (holding that male plaintiff who was attacked for, inter alia, walking and carrying his tray "like a woman" had established a viable sex discrimination claim).

affirmed a Title VII sexual harassment verdict, but more than sexual talk was going on. The male supervisor harassed a female employee with frequent questions and comments about her sexual activity. He joked about her sex life in front of others, and threatened her with firing when she objected to the mistreatment. The personal quality of the interrogations, the threat of job loss, and the more provocative context of a male boss and female employee discussing her sex activities distinguish *Farpella-Crosby* from this case.

Contrary to *Oncale*, and parting company with any requirement that ties alleged same-sex harassment to "objective truth," the majority opinion threatens to transform the American workplace with a judicially-enforced "code of civility." After all, any female working in an office dominated by females can follow Woods's example and complain she was harassed "because of" sex if the other ladies talk dirty to or around her. If bawdy epithets or misunderstood humor can be grounds for inferring same-sex gender stereotyping, then cautious employers must monitor and ban "offensive" speech and punish "offenders." The judgment should be reversed.

## 2. Expert Witness Testimony.

The majority dispenses in a footnote with the question whether a psychiatrist's testimony offered in support of EEOC's theory of liability was an abuse of discretion. I would hold that it was erroneously admitted, that its admission was harmful, and that the court's failure to grant a new trial was therefore an abuse of discretion. *Oncale* admonished juries and courts to use "common sense" in assessing same-sex harassment claims. We do not need expert psychiatrists to enlighten us about the meaning of juvenile and gross expressions and gestures.

Dr. Gold qualified as an expert in reviewing and assessing scientific articles addressing sexual harassment. Whether the activities she described as occurring at all-male, isolated work sites constitute legally actionable sexual

harassment was the principal issue before the jury. Although she did not opine on the testimony in this case, her opinions described research that tracked almost exactly the conduct and situation of the Boh Brothers work crew and Wolfe's actions in particular. She classified the same epithets that Wolfe used and the same conduct he engaged in as sex-stereotyping activity. Dr. Gold specifically defined sex harassment in *sociological*, not legal terms, and she defined it "from a social science standpoint" as based on plaintiff's *subjective* views.[10]

This testimony was inadmissible for two reasons. First, it dealt with a subject as to which expert testimony adds nothing significant to the experience of a lay jury. Her expertise did not "help the trier of fact to understand the evidence or to determine a fact in issue . . ." Fed. R. Evid. 702(a). Regarding this area of human relations and the intensely context-specific inquiry, judges and juries should be able to differentiate between bullying with sex words and bullying because the victim is a male. EEOC's en banc brief asserts a need for expert testimony because "[m]any laypersons serving on juries will have had little experience with or knowledge about the type of sexual harassment that occurs in unique, male-dominated work settings like police departments or oil-rig crews." Many laypersons serving on juries will not have been employed in any of the environments from which sex discrimination cases may spring, for example, sales forces, medical clinics, universities, or manufacturing plants. Each workplace has unique characteristics, but "common sense" informs juries whether objectionable behavior occurred "because of" a victim's sex.

Second, cloaked in the mantle of "expertise," her testimony had to confuse the jury between the "sociological" perspective, which, as she said, is solely based on the plaintiff's subjective views, and the legal definition of harassment that

---

[10] The court inadvertently heightened Dr. Gold's impact by admitting her videotaped deposition out of order at the conclusion of the evidence.

requires objective evidence of the harasser's motive and objectively severe misconduct. In this case, the potential confusion was heightened because Wolfe's discriminatory motive was shown at most by Wolfe's comment about Woods's use of Wet Ones; the only other "evidence" of motive was obscene words and gestures Wolfe directed at Woods as well as other workers, inspectors, and his own son. Thus, not only was the psychiatrist's testimony confusing on the standard of liability, but it was also the essential connector between Woods's allegations and a finding of harassment "because of" sex.

That expert testimony has occasionally been admitted in Title VII cases is not determinative of its admissibility in this novel and unprecedented case. Notably, in none of the sexual harassment cases cited by the majority or this dissent was expert testimony introduced to "explain" gender stereotyping harassment. Even more notably, although an expert witness testified in the seminal *Price Waterhouse* case, the plurality opinion says, "we are tempted to say that Dr. Fiske's testimony was merely icing on Hopkins' cake. It takes no special training to discern sex stereotyping in a description of an aggressive female employee as requiring " 'a course at charm school.' " 490 U.S. at 256, 109 S. Ct. at 1793. The employer, furthermore, did not challenge the admissibility of the expert's testimony. *See* 490 U.S. at 255, 109 S. Ct. at 1793. Justice O'Connor, concurring in the judgment, went out of her way to state her view that "testimony such as Dr. Fiske's in this case, standing alone, would not justify shifting the burden of persuasion to the employer [to prove a non-discriminatory basis for an employment action.]" 490 U.S. at 277, 109 S. Ct. 1805. She went on to demonstrate the importance of context in these cases:

> Race and gender always "play a role" in an employment decision in the benign sense that these are human characteristics of which decisionmakers are aware and about which they may comment in a perfectly neutral and nondiscriminatory fashion. For example, in the context of this case, a mere reference to "a lady candidate" might

54

show that gender "played a role" in the decision, but by no means could support a rational factfinder's inference that the decision was made "because of" sex. What is required is what Ann Hopkins showed here: direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision.

*Id*. If Woods could not show "direct evidence" that "[Wolfe] placed substantial negative reliance on an illegitimate criterion," *i.e.* Woods's sex, *without* an expert, then Woods's claim should fail. Only a new trial can test this proposition.

**3.    *Ellerth/Faragher* Defense:**

Under this defense, an employer will not be vicariously liable for harassment by a supervisor if it can show: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Watts v. Kroger Co.*, 170 F.3d 505, 509-10 (5th Cir. 1999) (quoting *Faragher*, 524 U.S. at 807, 118 S. Ct. at 2293) (internal quotation marks omitted).

Boh Brothers satisfied both aspects of the test as a matter of law. The majority opinion correctly notes that an employer can satisfy the first prong by promulgating an anti-harassment policy that includes adequate complaint procedures. Boh Brothers' nondiscrimination policy stated: "All personnel actions including, but not limited to, compensation, benefits, transfers, layoffs . . ., will be administered without regard to race, color, religion, disability, sex, or national origins" and "[a]ll working conditions will be maintained in a non-discriminatory manner." Although the majority opinion criticizes it for being broad, the language parallels Title VII. The Boh Brothers policy was posted at job sites, was mailed to employees, and was provided to them when

55

hired.   The company instructed employees that they could report to their supervisor, to someone in authority above the supervisor, to a job foreman, or to John Lipani, the corporate in-house counsel and an EEOC officer.

The majority opinion takes Boh Brothers to task for many alleged inadequacies in the company policy, even while it concedes that "proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance . . . ." *Ellerth*, 524 U.S. at 765.  Here, the proof's in the pudding: Boh Brothers had not one "cause" finding by EEOC in forty years preceding this case.  Surely the company should be credited for maintaining a successful policy *in practice*.  Every case must turn on its own facts.   In these circumstances, the majority's lengthy discussion of the formalities they feel should accompany anti-discrimination policies is gratuitous.[11]

Moreover, whether other employees had actually read the policy is irrelevant, because Woods knew how and to whom to complain about harassment.  He complained to Wolfe himself when Wolfe, in very bad taste, slurred Woods's daughter.  (This is the single event that brought tears to Woods's eyes.)  Significantly, Wolfe apologized and never repeated the action. He complained once to Tim Carpenter about Wolfe's urinating at the jobsite. Finally, Woods knew to complain to Duckworth about Wolfe's gross words and gestures.   He never did so until, after working more than six months under Wolfe, his own misconduct was reported.  There is no doubt that the company's general anti-discrimination or anti-harassment policy was known to Woods. Because Woods unreasonably failed to take advantage of corrective opportunities

---

[11] Boh Brothers took prompt remedial action by separating Woods from Wolfe as soon as Duckworth heard of Wolfe's behavior. *Hockman v. Westward Commc'n*, 407 F.3d 317, 329 (5th Cir. 2004) ("We have often found that the employer took prompt remedial action as a matter of law.") (citing several cases).

provided by the employer, Boh Brothers satisfies the second *Faragher* prong. *See*, *e.g.*, *Hockman*, 407 F.3d at 329.

Finally, the majority chastises Boh Brothers' management for being insufficiently aware of the law concerning same-sex gender stereotyping in all -male, isolated jobsites.  Ignorance of the law is asserted to be no defense.  My response is simple: if the EEOC required a psychiatrist to explain this phenomenon, one should not fault the company for having failed to describe it in official employee notices.  Further, as previously noted, no other circuit court has affirmed a verdict or denied an employer summary judgment based on the thin record in this case.  Other courts have rejected claims on similar facts or required that either the victim or harasser exhibit non-gender-conforming appearance or behavior.

Based on the company policy and Woods's plain understanding of his rights, this case would not have existed *but for* Woods's tactical delay in complaining.

For all these reasons, I respectfully dissent.

57

No. 11-30770
## ETIQUETTE FOR IRONWORKERS

**MEMO TO:**    Management

**FROM:**    Legal Department of Apex Co.

**DATE:**    September 2013

_____

In keeping up with the newest developments in employment law, we have carefully reviewed and hired specialist outside counsel to give us a legal opinion concerning the implications of a recent Fifth Circuit en banc decision. *EEOC v. Boh Bros*. . . . Like us, the employer in that case engaged in heavy construction and often operated in all-male crews. Like us, it had an unblemished record, years without a Title VII case. But the court ruled that common sexual epithets and vulgar gestures, when used too frequently by a male, heterosexual supervisor, can support a verdict against the company on behalf of another male, heterosexual plaintiff. Instead of looking on these actions as horseplay or, at worst, bullying, the court approved a jury verdict for "gender-stereotyping harassment." The EEOC intends to make this case an example for similar workplaces.

We need not advise you of the costs a company can incur in these cases. In addition to hundreds of thousands in outside legal fees, a judgment for damages may run into six figures. The EEOC requested, and got, a sweeping and intrusive injunction that will require significant expenditures in paperwork compliance costs and regular workplace sensitivity training for over one

thousand employees.

To avert these consequences, we recommend that the company immediately issue the following rules for proper, non-gender-stereotyping workplace behavior. Employees should be informed that the rules apply across the board, to all-male, all-female, and mixed-sex offices and positions. The workplace must be cleansed of speech and actions that may be misperceived or twisted as reflecting gender stereotyping harassment.

**NOTICE CONCERNING TITLE VII**

To our Associates:

You are all aware of this company's unwavering policy to prevent discrimination of any kind based on sex, race, religion or national origin. Because of a new court decision, we must now focus on eliminating same-sex "gender stereotyping" of any kind as well. This means that men may expose this company to liability for their speech and behavior in the presence of other men, and women in the presence of other women. Although these rules will apply throughout the company, you IRONWORKERS have to take special notice. The rules apply throughout the workday, during breaks and lunch hours, and whenever two or more workers are gathered together.

1.     At the most general level, all employees must refrain from any communication--spoken, written, or gesticulated--that may create any suggestion of "sexual stereotyping" or "gender-based bullying." Please consider the broad implications of this prohibition, some of which follow. All employee interactions must be fully gender inclusive (or at least gender ambiguous). Careless phrases and jokes will not be tolerated if they may be interpreted to carry a stereotyping overtone.

2.     No more banter about bodily functions, sexual or otherwise, or human physical appearance. Those who do not enjoy references to sweat, toilet

humor, tattoos, tight jeans, muscles, or large beards may feel singled out as not "man enough" for such speech.

3.  Do not discuss the appearance of women or any intimate sexual encounters, and do not refer to or use words that refer to sex in any way. This includes CUSS WORDS.

4.  Do not swivel your hips, make obscene gestures or mimic "twerking."[1]

5.  Avoid discussing topics that may be viewed as "non-inclusive": bodybuilding, Boy Scouts, hunting, fishing, and riflery. Football and other "macho" sports may be an unwelcome subject to those who consider them boorishly aggressive.

6.  Do not engage in any competitive activity, like lifting heavy objects, on the worksite. This can create a sense of unmanly inferiority for non-participants.

7.  Do not use gender-stereotyped nicknames or name-calling. Supervisors may not encourage you to work harder by saying "put your backs into it," or "man up," and terms like "ladies" or "sissies" will be grounds for immediate discipline.

8.  Schoolyard humor, which is common at our jobsites to fill down-times and relieve boredom, raises sensitive issues. Some workers may be put off by jokes about personal grooming, scented deodorant, chest hair, or clothing as a form of gender hostility. Poking fun at a worker for drinking a diet soda, not being able to eat a raw jalapeno, using "Wet Ones" or "Purell" to clean himself, or calling someone a "wimp" or "wuss" or "geek" may get us sued and you in serious trouble.

---

[1] *See Twerk Definition*, OXFORD DICTIONARY, http://oxforddictionaries.com/us/definition/american_english/twerk (last visited Sept. 3, 2013). "[To] dance to popular music in a sexually provocative manner involving thrusting hip movements and a low, squatting stance[.]"

9.  Asinine locker room behavior is forbidden.  Examples of this would be comments about anatomy, crude gestures, actions like towel-swatting, simulated sexual acts, and any behavior that would make someone ill at ease with his personal expression of his gender.  Relieving yourself in the presence of others is forbidden; the company is reconfiguring all restrooms to prevent any worker from observing another worker's bodily functions.

10. Avoid touching any coworker in any manner, except if asked to rescue the person from physical danger, and even then, avoid touching private areas.

**PENALTIES:**  A first violation of these rules will result in a warning, a second violation in suspension without pay, and successive violations will result in termination.  We will not call this a "three-strikes" policy, as that term might be interpreted to refer to the principally male sport of baseball.  We need hardly explain that any worker terminated for same-sex gender stereotyping will have a hard time finding future employment.

The Company will conduct quarterly sensitivity sessions, where you can learn more about offensive gender stereotyping against fellow males and what you can do to prevent or correct it.  As questions arise at any time, call our newly hired Sex Stereotype Counsellor in the HR Department.

No. 11-30770

JERRY E. SMITH, Circuit Judge, dissenting, joined by DeMOSS, Senior Circuit Judge.

By deftly extending the applicable law,[1] Judge Elrod and the en banc majority—with the best of intentions—take a deep bow at the altar of the twin idols of political correctness and social engineering. Because that is a demonstrable departure from reason and experience and imposes an unsustainable burden on private employers in Texas, Louisiana, and Mississippi, I respectfully dissent.

We can take a cue—for better or worse—from the National Football League ("NFL"). Regarding the notion that the venerable Washington Redskins franchise should be forced to change the name of its team because it might pique some American Indians, the NFL Commissioner stated, just a few days ago, that "what we have to do though is we have to listen . . . . If one person is offended, we have to listen."[2] That is apparently the radical agenda of the EEOC: to dumb down American discourse, at least in the workplace, to avoid any chance that someone might be annoyed.

By bizarre coincidence, just a week after Commissioner Goodell's statement, it was reported that four current NFL players are participating in an advertising "marketing blitz" to promote men's use of a brand of moistened toilet

---

[1] In regard to the law, I concur in the dissents of Judges Jolly, Jones, and DeMoss in their entirety. The purpose of this dissent is not to improve on their excellent legal explications but to expand instead on the practical impact of the majority's sincere but ultimately errant views.

[2] NBC Sports, "Pro Football Talk," Sept. 11, 2013, "Goodell on Redskins Name: 'If One Person Is Offended, We Have To Listen,'" http://profootballtalk.nbcsports.com/2013/09/11/goodell-on-redskins-name-if-one-person-is-offended-we-have-to-listen/.

wipes similar to Wet Ones.[3]  Apparently, and contrary to the position advanced by the EEOC and Kerry Woods, there is nothing shameful—even in the *macho* world of the NFL—about a man's openly using that product.

It would not be fair to accuse the en banc majority of adopting—at least not just yet—the position of Commissioner Goodell that we should worry if just one person is offended.  But the EEOC appears bent on moving precipitously in that direction.

At oral argument, I asked the EEOC's attorney to address a hypothetical: A male employee named Joe sometimes wears pink shirts to work, and his supervisor calls attention to him, saying something like, "Look, Joe's wearing a pink shirt again."  The supervisor never says, to anyone, whether he just does not like pink shirts or, instead, considers them insufficiently masculine, but in fact the supervisor's motivation is the latter.  I asked whether those facts would be sufficient for a finding of liability and damages for discrimination on account of sex, and the EEOC's lawyer replied "Yes" (if sufficiently severe and pervasive).

---

[3] The report reads in part as follows:

This has got to be one of the oddest promotions to involve NFL players . . . . Four NFL linemen have signed to help a small Venice, Calif., company crack a new market—moistened toilet paper—targeted at men.  The sector, just 3 percent of the $8.7 billion toilet paper category, is usually aimed at infants and toddlers but the four burly centers are hoping to change that with a product cheekily called "One Wipe Charlies."  The players—the Dallas Cowboys' Travis Frederick , the Minnesota Vikings' John Sullivan, the Buffalo Bills' Eric Wood, and the San Diego Chargers' Nick Hardwick—will be part of a marketing blitz, entitled "Clean Snap," to kick off in two weeks.  It's the brainchild of Mike Dubin, CEO of Dollar Shave, who told The Post:  "Most of the centers we approached were game to try this.  They are guys not a lot of people are reaching out to."  "We wanted to make something just for men; it's aspirational: a way to get it done in one," Dubin said . . . .  "I've been using wet wipes for years," said Dubin, "It[']s an enjoyable experience" . . . .

Claire Atkinson, "NFLers Line Up To Star in Ads for . . . Men's Toilet Wipes," NEW YORK POST, Sept. 17, 2013, http://nypost.com/2013/09/16/mens-wipes-ads-star-centers-not-tight-ends/.

No. 11-30770

I also gave a second hypothetical: The facts are the same, except that the supervisor's unspoken reason for making fun of Joe is that the supervisor just finds pink shirts to be aesthetically unattractive; Joe has no way of knowing whether the statements are a comment on his manliness. The EEOC's lawyer answered that those statements would not be actionable under Title VII.[4]

By the EEOC's reckoning, therefore, an employee can establish liability any time a jury could find that a comment or series of statements is meant to refer to the employee's failure to conform to some supposed standard of sex-based behavior. Take entertainment preferences, for example: If a supervisor even casually asks a female employee why she watches hunting and fishing shows on television (or if a man is asked why he enjoys the Home & Garden Channel), that could be the basis for a suit that, even if ultimately unsuccessful, would be expensive and disruptive to defend. A supervisor would be afraid to compliment a female employee for how well she lifts heavy boxes in the ware-house or to tell a male subordinate how tastefully he has decorated his office.

The positions taken by the EEOC *in toto*, and the majority opinion in large part, also emasculate[5] the employment-at-will doctrine[6] that, until now, was

---

[4] The attorney's answer is squarely at odds with the testimony of the EEOC's expert, Dr. Liza Gold, who, as Judge Jones points out, opined that sexual harassment should be viewed sociologically and from the plaintiff's subjective perspective rather than according to the motive of the alleged harasser. By Dr. Gold's account, therefore, the second pink-shirt hypothetical, in which the supervisor views pink shirts as unattractive but not unmanly, presumably would still result in an actionable claim for discrimination on account of sex because the motive of the supervisor (whether spoken or secret) would play no part. If adopted, Dr. Gold's view would impose a "zero-tolerance" regime on the workplace whereby certain comments would be unlawful if they offended any one person and were sufficiently severe and pervasive.

[5] Maybe I should not use that word because it is much too male-centric and might offend women who feel excluded. So I could say "eviscerate," but that might upset those who find hunting and warfare offensive. I could use the word "subvert," but that connotes sinister motive and might offend those who believe that all sincere points of view are morally

(continued...)

No. 11-30770

alive and well in Texas, Louisiana, and Mississippi. The only way an employer can avoid the real possibility of suit and ultimate damages is to take the position of Commissioner Goodell and make sure that nothing is uttered in the workplace that could possibly offend even a single person. Enlarging the kinds of supervisors' statements that employees can use to claim damages leads to additional grounds for suit (even on bases other than race, sex, age, or disability) because, possibly, the employer is "unfair" or "mean" or the working environment is "unpleasant" or "oppressive."[7]

In a world in which comments on Wet Wipes or pink shirts can be considered discrimination *on account of sex*, the American workplace becomes more like a prison than a place for personal achievement, individual initiative, and positive human interaction; one's speech is chilled as a condition of keeping one's job. As Judge Jones accurately observes, the majority opinion "portends a government-compelled workplace speech code"—"a 'code of civility' [imposed] on the American workplace." Instead of resisting such an Orwellian regime, in which Big Brother (in the form of the EEOC or otherwise) constantly monitors the worksite to detect "improper" words and thoughts, the en banc majority fosters it without Congressional mandate.

---

[5] (...continued)
equivalent.

[6] As we all know, the employment-at-will doctrine describes "[e]mployment that is usually undertaken without a contract and that may be terminated at any time, by either the employer or the employee." BLACK'S LAW DICTIONARY 604 (9th ed. 2004).

[7] "Since the mid-1980s, the creation of exception after exception to the at-will employment doctrine has threatened to swallow the rule. Four major categories of exceptions have emerged: (1) statutory exceptions for protected classes; (2) public-policy exceptions; (3) implied-contract exceptions; and (4) exceptions on the covenant of good faith and fair dealing." Paula G. Ardelean et al., "The Development of Employment Rights & Responsibilities from 1985 to 2010," 25 ABA J. LAB. & EMP. L. 449, 452 (2010).

The hypersensitivity that is blessed unintentionally by the majority nudges the law in a direction that hastens cultural decay and undermines—if even just a little bit—an important part of what is good about private employment in the United States. Societies, and the legal systems of which they are mutually supportive, decline slowly, but ultimately with tragic consequence: "Not with a bang but a whimper."[8]

---

[8] T.S. Eliot, "The Hollow Men." (To be hypersensitive, maybe Eliot should have said "The Hollow Persons," but even that term might offend non-humans because it is anthropocentric.)

No. 11-30770

HAROLD R. DeMOSS, JR., Senior Circuit Judge, dissenting, joined by JONES and SMITH, Circuit Judges.

I concur in Section IV, part B of the majority opinion, which reverses the jury's punitive damages award. I further concur completely in Judge Jolly's dissent. I write separately to express my dissent to the majority's decision to remand to the district court to determine whether the evidence is sufficient to support the jury's compensatory damages award.

The jury awarded $200,000 in compensatory damages and $250,000 in punitive damages. These two damage awards totaled an aggregate of $450,000, which exceeds the statutory limit on damages of $300,000 by $150,000. *See* 42 U.S.C. § 1981a(b)(3)(D). The district judge thus faced the issue of reducing these awards to comply with the statutory limit. The statute offers no guidance as to how a court should reduce an award to comply with the statutory cap. A review of the relevant case law further reveals no established method for reducing an award to comply with the statutory cap. Thus, a number of options are available to a district court when reducing damage awards to comply with the statutory cap. For example, the district court could evaluate the sufficiency of the evidence supporting the damage awards and reduce the awards on the strength or weakness of such evidence. If the district court finds that the damage awards are both supported by the evidence, then the district court could reduce each award by $75,000, which would represent one–half of the $150,000 excess. The district court could also reduce the compensatory damage award by 4/9ths of $150,000, and reduce the punitive damage award by 5/9ths of $150,000, which results in a proportionate distribution of $150,000, the amount exceeding the statutory cap. In this case, the district court's order reducing the damage awards to comply with the statutory cap does not expressly state how or why it reduced only the

compensatory damages award from $200,000 to $50,000.

The majority opinion concluded that the evidence in this case does not support the jury's punitive damages award. The majority opinion remanded the issue of the sufficiency of the compensatory damages award to the district court for reconsideration.  I respectfully dissent from such conclusion.  First, neither party has raised an issue as to the correctness of the district court's entry of $50,000 as the quantity of compensatory damages. Secondly, as noted by the majority, the district court has already indicated that the evidence supporting the jury's compensatory damages award of $200,000 was not supported by the evidence.  The mere fact that a majority of this court has reversed the error of the district court in ordering the jury's award of punitive damages should not, in my opinion, allow the district court to redetermine the award of compensatory damages.